Margaret Hunt HILL, Trustee for Hassie Hunt Trust, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

PLACID OIL COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

Nos. 20375, 20386.

United States Court of Appeals Fifth Circuit.

July 23, 1964.

Thomas G. Crouch, Robert W. Henderson, Dallas, Tex., for petitioner Hill.

Paul W. Hicks, W. Scott Wilkinson, Shreveport, La., for petitioner Placid Oil Co.

Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel, FPC, Peter H. Schiff, Atty., Leo E. Forquer, Asst. Gen. Counsel, John W. Williams, Atty., FPC, Washington, D. C., for respondent.

Before BROWN and WISDOM, Circuit Judges, and JOHNSON, District Judge.

JOHN R. BROWN, Circuit Judge.

The question in this case is whether it is too late for an Agency to declare the standards to be met by its decision holding that they have not been met. The answer, quite obviously, is in the affirmative. That this problem occurs is just further proof of the incessant challenge to the administrative process and the necessity for resourceful

ingenuity in the efficient management of it brought about by the first, 1954, Phillips [1] decision holding that producers are subject to the Natural Gas Act. We reverse.

One of the problems, of course, is the fact that with at least a considerable present blessing from the Supreme Court [2] the Commission for very good reasons has generally abandoned cost-of-service regulation for area pricing. But every now and then, for some reason thought wise or inescapable, the Commission severs a case or otherwise has to treat it on more "traditional" grounds. Such are these cases. The Producers [3] in May 1962 filed separate § 4(e) [4] applications for a rate increase from 21.5¢ to 23.5¢ under a gas purchase contract covering South Louisiana production.[5] The Commission suspended the effectiveness of the rate to December 1, 1962. The applications were consolidated with similar South Louisiana gas rate proceedings, and set for hearing on July 16, 1962. The hearings were concluded in four days, and with an Examiner's decision bypassed, the Commission, by

opinion No. 369, and over the strong dissents of Commissioners Ross and Morgan, on November 30, 1962, granted the motion of the Staff (and certain intervenors) to dismiss the application for failure to make out a *prima facie* case. 28 FPC 897.[6] Oddly enough, while presumably holding on the merits that the proposed increased rates were not "just and reasonable," § 4(e), the Commission expressly stated that the Producers could immediately refile the same proposed increases and start the whole thing over. In the meantime, of course, the dismissal put an end to the right of the Producers to collect the increases subject to refund. This is a practical escape mechanism reflecting an adjustment between traditional common law notions of res judicata which are apparently discarded here in order to avoid the triggering of other rate increases as to other producers. We mention it, not to criticize or approve the mechanism as such, but to highlight at the outset the Commission's awareness that its final opinion 369 was the first real authoritative declaration of the standards which these producers would have to meet.

1. Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L. Ed. 1035.

2. Wisconsin v. Federal Power Commission, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357. This is the second Phillips decision.

3. We shall speak of them indiscriminately as Producer or Producers. They are related interests.

4. 15 U.S.C.A. § 717c(e).

5. The Commission's brief points out that each of the three rate schedules involved here relates to a sale which had not been finally certificated at the time the increases were filed. Although initially certificated, these were effectually vacated in the Seaboard-Transco per curiam, Public Service Commission of New York v. FPC, 1959, 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237, following the court's earlier CATCO decision, Atlantic Refining Co. v. Public Service Co. of New York, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L. Ed.2d 1312. On remand, new certificates were issued conditioned upon (1) charg-

ing an initial price of 20¢ per m.c.f.; (2) refunding the difference between the 20¢ price and the price collected for sales made prior to the effective date of the order, i.e., July 17, 1963; and (3) not filing any increased rates in excess of 23.55¢ pending the issuance of a final decision in the area rate proceeding in Docket No. AR 61–2, or until July 1, 1967, whichever is earlier. These requirements have been stayed pending outcome of the review proceedings now pending and under submission before another panel of this Court in Callery Properties, Inc. v. FPC, 5 Cir., Nos. 20872, 20885, 20890, 20891, 20892, 20967, 20989, 21028. One rate (Schedule No. 22) relates to a sale presently being made under a temporary certificate. Still another panel has recently dealt with some of the consequences of a reversal and vacation of a permanent certificate and conditions attached to the temporary subsequently issued. Hunt Oil Co. et al. v. FPC, 5 Cir., 1964, 334 F.2d 474.

6. Rehearing was denied January 15, 1963, 29 FPC 84.

■ The Producers make three principal attacks. The first is that the hearing lacked basic fairness because the standards were never announced until it was all over. The second, under various headings, is that on the undisputed facts the Producers at least made out a "prima facie" case for the increase. The third is that the right to an increase was established beyond question. We do not get to the second and third branch because it is the Commission, not the reviewing Court, to whom Congress has initially committed the important role of rate review.

In a broad sort of way, the Commission held that the Producers' proof did not meet the standards laid down in Phillips, 24 FPC 537.[7] Discussed in more detail later on, two principal deviations or deficiencies were found. The first was the use of "sales volume" rather than "production volume" of gas in the allocation of joint oil-gas costs. The second was the failure to include "some gas condensate production in the 'gas only leg' of the relative cost computation." It was these two asserted deficiencies which for all practical purposes the Commission found, would alone destroy the "prima facie" case. Of course there were a number of others, some of importance, others quite secondary, which we need not specify. The Producers sought, but were denied, the right to a

further hearing to meet or overcome these deficiencies and to supply the proof now determined to be essential.[8]

These deficiencies in the rate application asserted by the Commission highlight the Producers' basic claim: the standards were not announced until the decision which simultaneously held that the proof was insufficient to make out the "prima facie" case under them. The Commission's answer—or rather, the rationalization of its decision by the General Counsel—is that for all who would read, Phillips was the answer, if not alone, then by contentions which others— intervenors, Staff, etc.—were making in other cases.

■ We are of the definite view that Phillips[9] was no crystal ball, and the Commission had the duty at some stage prior to the close of proof to declare what it considered the relevant standards to be.

We need not examine Phillips in detail. The Supreme Court in the 1963 second Phillips case[10] dwelt at length on the Commission's conclusion in Phillips that the school of hard knocks had demonstrated that the traditional utility-prudent-investment-cost-of-service type of rate regulation was not the answer.[11] Rather, Phillips was a stop-gap decision on out-moded test year figures for this one producer and a general pronounce-

7. Opinion No. 338, aff'd sub nom. Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357.

8. Producers have filed in this Court appropriate motions to produce evidence. We have expressly deferred determination pending final decision. In view of our remand for further hearing, further orders are unnecessary.

9. Unless otherwise expressly stated, reference to Phillips is to the Commission's order No. 338, see note 7, supra, and not the Supreme Court decisions of 1954 and 1963.

10. Wisconsin v. Federal Power Commission, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357.

11. Concluding its general characterization of the Commission report, the Court

stated: "Further, the Commission noted that the individual company cost-of-service method gave rise to staggering cost allocation problems, could result in such anomalies as widely varying prices for gas coming from a single field and even from a single jointly owned well * * *." 373 U.S. 294, 300, 83 S.Ct. 1266, 1270.

This had reference to the Commission's statements in Phillips about the allocation problems inescapably involved in the cost of service approach. "The fact that * * * we can, by making numerous arbitrary allocations and estimates, arrive at a calculated unit cost of gas does not prove to anyone's satisfaction, including ours, that we have thus solved the problem of fixing prices for natural gas sold by independent producers." 24 FPC 537, at 542.

ment that from here on out, the solution was to be found in area pricing. This got a considerable blessing from the Court which restated what it had long made clear that "just and reasonable" did not tie the Commission to any one method. It was the result, not the route taken, that was important.[12]

Probably most significant, the Commission in Phillips, recognizing that allocation was indispensable in the cost of service approach, disclaimed any purpose of laying down in Phillips any fixed standards to be followed in what it hoped would be the very few cost-of-service cases pending the day when all would be washed out by area pricing.[13] In the

meantime the Commission had itself manifested that Phillips was not a panacea, that for many cases the factors there applied would not be relevant to other situations.[14]

Whatever vitality the Commission intended for Phillips as to cost of service rates for producers other than Phillips itself, it is plain that when these hearings were ordered for July 1962, there was no indication what standard was to be applied. The Commission never even so much as breathed the name Phillips and indeed declined categorically to give to the earnest plea of one of the bewildered petitioners [15] anything but the

12. "But to declare that a particular method of rate regulation is so sanctified as to make it highly unlikely that any other method could be sustained would be wholly out of keeping with this Court's consistent and clearly articulated approach to the question of the Commission's power to regulate rates. It has repeatedly been stated that no single method need be followed by the Commission in considering the justness and reasonableness of rates. Federal Power Comm'n v. Natural Gas Pipeline Co., 315 U.S. 575 [62 S.Ct. 736, 86 L.Ed. 1037]; Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333]; Colorado Interstate Gas Co. v. Federal Power Comm'n, 324 U.S. 581 [65 S.Ct. [815] 829, 89 L.Ed. 1206] and we reaffirm that principle today. * * * More specifically, the Court has never held that the individual company cost-of-service method is a sine qua non of natural gas rate regulation. * * *" 373 U.S. 294, 309, 83 S.Ct. 1266, 1274.

13. See, e.g., "In view of the advantages of the various methods [of allocation] we are unable to arrive at a rigid formula for the allocation of exploration costs, nor do we think it would be desirable to do so. The relationship of gas prices and oil prices, the relationship of gas to oil and the corporate economy and other factors will differ from case to case, so that an equitable allocation must vary in order to reflect the place that gas and oil hold in each producer's exploration program." 24 FPC 537 at 558.

14. Thus in In re. Alfred C. Glassell, G-9278, 25 FPC 1071 (1961), the Com-

mission used the BTU method instead of the Phillips relative cost allocation stating, "We are therefore unable to use the * * * method * * * used in Phillips." Murphy Corporation, et al., Docket No. G-9548, et al., 25 FPC 334 (1961); H. F. Sears, Docket No. G-6502, 18 FPC 244 (1957); A. E. Herrmann Corporation, Docket No. G-6623, 18 FPC 244 (1957). The Producers also advise us that numerous decisions rendered by Commission examiners subsequent to September 28, 1960, have followed rigidly the formula utilized in Opinion No. 338. In Re Hunt Oil Company et al., Docket No. G-9065 et al., issued October 2, 1961; In Re Sun Oil Company et al., Docket No. G-8288 et al., issued March 11, 1963; In Re Sohio Petroleum Company et al., Docket No. G-8488 et al., issued October 30, 1962; In Re Texaco, Inc., et al., Docket No. G-8969 et al., issued January 15, 1963; In Re Tidewater Oil Company, Docket No. G-13310 et al., issued September 14, 1961; In Re Amerada Petroleum Corporation, Docket No. G-9385 et al., issued April 9, 1962; In Re Slade Incorporated, Docket No. G-19986 et al., issued November 1, 1961.

15. One of the producers formally requested advice " * * * as to whether company-wide costs or only local costs should be adduced * * *" and advice concerning " * * * any other matters deemed by the Commission to be crucial * * * in order that we may avoid the possibility that we may fail to speculate correctly as to the Commission's views on these important matters * * *."

most perfunctory and uninformative reply.[16]

Of course for those who had been struggling with this problem since the fallout of 1954, this was, at best, a lecture to indicate that while not there expressed, somewhere in the bosom of the Commission there was full understanding and identification of applicable standards. And this was so even though the Commission in 1955 had thrown up its hands in its then formalized attempt to ferret out, assay and declare them in Docket R–142 bearing the ambitious heading of "Consideration of Principles and Methods to be Applied in the Fixing of Rates to be Charged by Independent Producers for Natural Gas Sold in Interstate Commerce for Resale." [17]

And the quandary was not confined to counsel. At the commencement of the hearing, the presiding Examiner joined the lamentations in response to an inquiry of a producer's counsel.[18]

The uncertainty of Phillips as a code of standards is even more unmistakably revealed by the candid statements in the General Counsel's brief before us. Thus, the brief states, "We recognize, of course, that producer rate making standards are still in a formative stage * * *." At most " * * * the commissions, municipalities, and any other interested persons to submit information, data, views, comments or suggestions in writing concerning the problem. * * *'

---

16. The Commission's reply to the inquiry, note 15, supra, was:

"Under Section 4(3) of the Act the burden of proof to show that the increased rate or charge is just and reasonable is upon the natural gas company. Thus, the natural gas company bears the responsibility, in the first instance, of determining the type of evidence that it shall present at the hearing. We are not in a position at this time, in the absence of a record and briefs on the subject, to authoritatively decide the myriad of issues set forth. * * *"

17. The order in Docket R–142 recited:
" '2. Necessary to a determination of the rates permitted by the Natural Gas Act to be made, demanded or received by a natural-gas company is the choice of methods to be used in determining the just and reasonable rate for any particular sale. The Commission, recognizing the basic differences between the operations of a producer and those of a pipe-line company, is desirous of securing any information, suggestions or proposals bearing upon the possible effect the several approaches might have upon the public interests towards which the Natural Gas Act is directed.
" '3. The Commission, therefore, is inviting the submission of suggestions as to the principles and methods to be applied by it in its regulation of the rates to be charged by independent producers for the transportation or sale of natural gas subject to the jurisdiction of the Commission. * * *
" '4. This is a matter of national importance and the Commission invites members of the industry, producers, gatherers, interstate pipe-line companies, distributors, consumers, groups and associations representative thereof, State

" * * * [A]fter hearings in R–142 scheduled in December 1954 and held at various times in 1955, the Commission by order December 1, 1955, terminated R–142 with this significant finding:
" '* * * the information gained in this proceeding convinces us that, on the basis of the record herein, we should not lay down any rules as to what would be necessary or appropriate for consideration in determining the just and reasonable rates of any independent producer subject to our jurisdiction under the Natural Gas Act.
" 'Accordingly, after full consideration of the suggestions, comments, and recommendations submitted, it appears to the Commission that adoption of any standards, principles, or methods respecting the matters and issues involved herein is not appropriate or necessary in carrying out the provisions of the Natural Gas Act. We so find.' " Deep South Oil Co. v. FPC, 5 Cir., 1957, 247 F.2d 882, 896–897, n. 18 (dissenting opinion).
A similar effort on a more modest scale was apparently initiated in Champion Oil and Refining Co., G–9277, G–9280, et al., 1957, 18 FPC 782.

18. The Examiner stated: "Well, I don't know [where] to tell you to look for guidance * * * except to the decision of the Courts in the Phillips case of June, 1954, and the decisions of the Commission since that date. I am writing a decision now in which I wish I had greater guidance, but I don't have it. * * *"

Phillips case" might be regarded "as a generally pertinent common law precedent [which] * * * pointed to the standards of proof to be met" although "much remains to be clarified through a case-by-case * * * development." In Phillips "the Commission explained * * * certain principles and approaches * * *" and the "explanations, in general, provide guidelines that may appropriately be followed * *." But the caveat is sounded that this "is not to say Phillips can be followed mechanically." To end this short summary of these comments, the brief recognizes that since Phillips cannot "be followed mechanically * * * it may be necessary to adapt the principles of Phillips to the different fact situation of another case." And, of course, the "validity of such adaptation will depend on its reasonableness."

This brings us to some of the deficiencies which destroyed the *prima facie* case.

Specifically, there is nothing in Phillips compelling the use of wellhead production volumes rather than "sales volumes." The cost of service adopted by the Commission in Phillips was based on its own cost studies in which what may be loosely described as modified production were used.[19] More than that, the Commission's brief here recognizes that

"it is true that the matter was not directly in issue in Phillips, where both production and sales volumes were furnished." The fact is, as the dissent of Commissioner Ross points out, "it was not until October (of 1962) in the Hunt case * * * that this matter was considered by the Commission."

Even more bewildering is the criticism concerning the elements to be included in the so-called gas leg of the relative cost computation.[20] Quite positively, Phillips offered no guide. Thus, the General Counsel's brief tells us, "in Phillips 60 per cent of the company's gas production came from so-called 'gas-only' leases; accordingly, there was no difficulty in determining a gas leg * * *." The situation, however, in our case was quite different. For example, Placid's gas-only leases account for less than 1 per cent of its gas sales, while 89% was condensate gas. Since Phillips did not point the way specifically, the Producers' cost of service materials for the gas leg submitted with these rate applications included not only costs related to gas-only leases, but also all gas condensate leases. This practice was attacked in cross examination and in its initial decision was categorically condemned by the Commission. "Some gas condensate production should be included where the gas-only leg is too small for an adequate sample, but only the minimum necessary

19. This is recognized by the Commission in its order denying rehearing on January 15, 1963, 29 FPC 84, see note 6, supra. The figures used were "wellhead production volumes less flared or wasted gas or liquids."

20. This is inherent in the relative cost method of allocating joint production costs between gas and liquids. The procedure is to determine the unit cost of producing gas from "gas-only" leases. This is done by dividing the total costs of production from such leases by the number of Mcf of gas produced from them. The unit cost of producing gas from gas-only leases (the so-called gas leg) is multiplied by the number of units of gas produced from joint-product leases, and the unit cost of oil from oil-only leases is multiplied by the number of

units of oil produced from those leases. The two figures derived state, in effect, what the gas and oil from the joint-product leases would have cost had they been produced from single-product leases. These two dollar amounts make it possible to compute the ratio of the total costs that would have been incurred in producing gas if all the gas had come from gas-only leases and all the oil had come from oil-only leases. Using ratios determined in this manner, the gas portion of the total actual production costs of the joint leases is then assigned to gas. The theory of this method of allocation is that the portion of the cost related to producing one of several products from joint-leases is the same as the ratio of production costs of those products produced by themselves.

to assure inclusion of a representative portion of gas production in the gas leg. To include *all* condensate has not been shown to be reasonable." [21] Trying to satisfy the undisclosed demands of the Commission, the Producers, by proposed additional evidence appended to their briefs on submission to the Commission, excluded these criticized items. Having first put them in, then taken them out, the producers learned that the Commission was still not satisfied. The Commission now condemned the Producers because they "made no attempt to include condensate in the gas leg in such proportion as would suffice to produce a reasonable sample." The failure, it said, "left [the producers] with such a thin gas leg in its reworked studies as to make meaningless its revised allocation of joint production cost." [22] Closer to the scene than we, Commissioner Ross, dissenting, describes the Producers' predicament as that of one who " * * * occupies the unenviable position of being damned if he does and damned if he doesn't." [23] From these extremes—(1) all or (2) none—one can now distill the requirement that "some gas condensate production should be included" but it should be "only the minimum necessary to" include "a representative portion of gas production" to supply for the Commission "an adequate sample." [24] But the simple fact is that this "some but not all," "adequate sample" requirement applied decisively in this case was announced by Commission for the first time in Hunt Oil Co., Opinion No. 365, 28 FPC 623, issued October 17, 1962, some three months after the record in this case closed. But unlike Hunt, in which the Producers were granted the right to bring forward additional evidence to meet the newly declared standards, the Commission here declined such right largely because to

"remand this case would not only lead to the triggering of almost a million dollars a year in rate increases, but would result in the collection of rates, which even if collected subject to refund would create a new higher price 'plateau' for natural gas." [25]

██ In this setting we are clearly of the view that the procedure here followed by the Commission deprived producers of a fair and adequate hearing because the standards to be applied were neither evolved nor announced until the decision holding them unsatisfied. Commissioner Ross, dissenting, summed it up accurately.

"The propriety of our motion to dismiss assumed the existence of standard. Quite clearly, it makes no sense to ascribe a 'burden of proof' to parties, or even to emphasize the existence of such a burden, without having first described the nature of the burden. * * * Thus, the basic issue before us is whether the Commission had established standards in advance of the hearing in this case which described the criteria to be applied to applications for rate increases under Section 4(e) * * *. The majority takes the position that such standards are clearly defined in the Phillips opinion. I flatly disagree. * * * [In July 1962] this new Commission had *never* stated its views with respect to the standards it would apply to 4(e) proceedings. Until the issuance of our recent Hunt order generally reaffirming the so-called Phillips approach, there was considerable speculation in the industry as to whether this Commission would utilize any kind of a cost of service method in 4(e) proceedings. Significantly, that Hunt order was re-

21. (Emphasis, the Commission's.) 28 FPC 897, 902.

22. 28 FPC 897, at 904.

23. 28 FPC 897, 907, at 909 (dissenting opinion).

24. 28 FPC 897, at 902.

25. 28 FPC 897, at 905.

leased on October 17, 1962—*well after the time the hearing was concluded in the instant proceeding.* Even assuming the industry was psychic enough to realize in advance our general reaffirmance of Phillips, that case constitutes a very feeble elucidation of the principles governing 4(e) proceedings. As a matter of fact, the whole tenor of the Commission's decision in that case was a rejection of individual cost of service methodology in favor of an area approach." [26]

The dissenter was on sound ground. More than a quarter of a century ago in Morgan v. United States, 1938, 304 U.S. 1, 18–19, 58 S.Ct. 773, 776, 82 L.Ed. 1129, the Court declared:

"The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."

These principles are still very much alive. In the APA Congress provides that "[p]ersons entitled to notice of an agency hearing shall be timely informed of * * * (3) the matters of fact and law asserted," 5 U.S.C.A. § 1004(a). And the Court, within the year, has expressly relied on Morgan v. United States in Willner v. Committee on Character and Fitness, 1963, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224.

■■ To require that the Commission formulate the standard to be met will neither force unrealistic rigidity in the content of those standards nor bring about administrative inefficiency. We would not for a moment suggest that the Commission should, or could for that matter, lay down once and for all the standards to be applied in natural gas producer cases. We have emphasized the flexible, unfixed, frequently vague, factors and the slight or substantial deviations from Phillips and others, out of no spirit of criticism for the lack of consistency on the Commission's part. Rather, we have done so to highlight the fact that in the informed, expert judgment of the Commission based upon its long struggle, experience has demonstrated the impossibility of contriving a single test or series of tests by which to measure "just and reasonable" rates. Courts have extended, and continue to give, the Commission almost a free hand. (See note 12, supra). And the Commission's own reports show that even with respect to cases to be judged on the so-called cost-of-service basis, many internal adjustments are required to take into account the peculiar circumstances relating to the particular producer, the area, engineering or geological difficulties, problems of exploration, production, transportation, or the like.

But investing the Commission with such wide latitude imposes a correlative burden on the Agency. From a substantive standpoint, it must of course always make certain that the differences in treatment are rationally founded to avoid the charge of arbitrary discrimination. And procedurally it must make sure that those who are to be judged by the standard evolved to meet the exigencies of that particular case are advised of it in time to have a fair opportunity to meet it. Quite obviously, this is, or may well, call for adaptations which would be quite foreign to the traditional utility-type rate inquiry. In the traditional case the criteria will have long been established and all will know of the likely necessity of meeting one of the

26. 28 FPC 897, at 907–908 (dissenting opinion).

usual subsidiary standards, such as prudent investment, cost of reproduction less depreciation, or the like. But in this field, as illustrated by the difficulty of determining just how much production from gas condensate leases should or should not be included to obtain a fair representative sample, the broad legal tests are of little help either in ultimately deciding the case or in ascertaining what sort of evidence might be required. Chief Judge Tuttle emphasized this for the Court in Gulf Oil Corp. v. FPC, 5 Cir., 1958, 255 F.2d 556, 557:

> "This is concededly a difficult standard to specify especially in light of the fact that producers are in reality selling gas which they own and are not, in the traditional sense, primarily furnishing a service to the public."

■ One probable adaptation which would be workable and fair would be in effect to conduct the rate hearing in two main stages. The first would afford an opportunity for the full development of the evidence bearing upon the peculiarities or special circumstances of any particular case, producer, or the like, out of which the standards to be applied would be evolved. Such standards would then authoritatively be announced, and the parties given a reasonable opportunity in the second stage to satisfy the consequent burdens imposed.

■ This plan is neither unworkable, inefficient, or visionary. Indeed, this record demonstrates how it could have been employed effectively. In so doing, the case demonstrates also that the legal mechanism of the motion to dismiss is of dubious value in an undertaking calling for the delicate adjustment of so many variable factors. Here, for example, without ever having declared any standard of sufficiency, it was first thought that too much condensate gas production had been loaded into the costs. At a later stage it was thought there was too little. What is enough? How many or how much will be needed to make the sample a fair one? Likewise, in allocating exploration costs to crude oil, should the economic factor be 3–1 or 4–1? In allocating such costs between condensate and gas, what sort of an economic factor should be employed? As to these and many other factors, the Commission seemed to require a letter perfect application with letter perfect subsidiary elements. It declined to undergo the judicial travail of weighing those portions on which complete information was furnished simply because certain computations were then announced for the first time to be wrong. The Commission simply held as a matter of law that because in the evidentiary material and schedules the Producers claimed more than they ought to, sought the inclusion of elements in excess of that which the newly declared standards would permit, the whole thing had to be dismissed outright.

■ In the judicial-administrative adaptation imperatively called for because of these unavoidably shifting, constantly developing substantive standards, the Commission at that stage had at least two methods of dealing with these asserted deficiencies, none unduly disruptive of rate regulation. First, as to matters on which full information was revealed (as was true in many instances), the Commission could have exercised the judicial responsibility committed to it of evaluating the extent to which the evidence under proper standards did or did not support the proposed increase. Or second, it could have announced the standards with instructions to the Producers to recast the information in the form now demanded after which the case would proceed in the normal course.

■ Of course there are other likely variations, but the prospect need not be disturbing. Courts are finding day by day that there is both a need to meet extraordinary problems and ample procedural resources available to do the

job.[27] Litigation is frequently and most efficiently handled in defined stages.[28] Certainly no adjudicatory tribunal is faced with a more formidable task than is the Commission as it undertakes to solve and then master the responsibilities imposed on it by the 1954 Phillips decision. We have frequently pointed out that the Commission has demonstrated great resourcefulness in handling with an over-burdened staff and limited resources the monumental and increasingly unmanageable task. Hunt v. FPC, 5 Cir., 1962, 306 F.2d 334, 343, n. 15; Texas Eastern Transmission Corp. v. FPC, 5 Cir., 1962, 306 F.2d 345, 347, n. 2. But this case illustrates that again the quickest way through is the longest way around. After hearings terminating in 1962 by precipitous orders dismissing the applications outright, the cases must go back two years later presumably to start the laborious process all over again. And were we not reversing for further hearing, the Commission's own invitation to refile immediately for the identical rate increase would have set the same machinery in motion. In the meantime the pendency of the applications unresolved would add further disturbing uncertainties, the prospect of added collections under refund all with the likelihood that these may entail the very triggering which the Commission properly seeks to minimize.

We would therefore join the Supreme Court in its admonitions to the Commission that it exploit to the maximum with all resourceful ingenuity the means of coping with this task.[29] Since it is dealing with a problem which is undulating by nature, it cannot, as it did here, content itself with traditional procedures. It must adapt these to the peculiarities of this business. This means here that when it evolves standards, it must declare them in a way and time to give those affected a meaningful opportunity to meet them.

And, of course, what we do here is what we required in Bel Oil Corp. v. FPC, 5 Cir., 1958, 255 F.2d 548, 553, and Forest Oil Corp. v. FPC, 5 Cir., 1959, 263 F.2d 622, 626. In each, after first holding that the Commission was entitled to conclude that the producer's case did not meet the standards for a rate, we modified the orders sufficiently to permit a further rehearing. We emphasized in Bel Oil what is true here, that the parties are entitled to an opportunity "to introduce evidence" on those elements of a rate base which the Commission "in its written opinion" dismissing the applications held, "for the first time" to be "an essential part of such an inquiry." 255 F.2d 548, 553.

Reversed.

27. As a matter of good judicial administration in the husbanding of limited judicial manpower, extraordinary resourcefulness and adaptation have been demonstrated in recent decisions of both the Supreme Court and this Court. Shenandoah Valley Broadcasting, Inc. v. AS-CAP, 1963, 375 U.S. 39, 84 S.Ct. 8, 11 L.Ed.2d 8, opinion modified and rehearing granted in part, 1964, 375 U.S. 994, 84 S.Ct. 627, 11 L.Ed.2d 467, 468 (dissenting opinion); Bartone v. United States, 1963, 375 U.S. 52, 84 S.Ct. 21, 11 L.Ed. 2d 11; United States v. Mayton, 5 Cir., 1964, 335 F.2d 153; Burton v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1964, 335 F.2d 317; Benson v. United States, 5 Cir., 1964, 332 F.2d 288; Whitney v. Wainwright, 5 Cir., 1964, 332 F.2d 787; Anderson v. United States, 5 Cir., 1963, 318 F.2d 815; Juelich v. United States, 5 Cir., 1963, 316 F.2d 726.

28. Weinstein, Routine Bifurcation of Jury Negligence Trials: An Example of the Questionable Use of Rule Making Power, 14 Vand.L.Rev. 831 (1961); Rossano v. Blue Plate Foods, Inc., 5 Cir., 1963, 314 F.2d 174; Southern Ry. Co. v. Tennessee Valley Authority, 5 Cir., 1961, 294 F.2d 491.

29. Wisconsin v. FPC, 1963, 373 U.S. 294, 371–373, 83 S.Ct. 1266, 10 L.Ed.2d 357; FPC v. Hunt, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878, 886.