**CENTRAL ARKANSAS AUCTION SALE, INC., Major Lewis, d/b/a Major Lewis Livestock Auction Sales, Bill Rice and Lois Rice, d/b/a Cleburne County Livestock Auction Sale, and Travis McGee, d/b/a Atkins Livestock Auction, Appellants,**

v.

**Bob BERGLAND, Secretary of Agriculture, and the United States of America, Appellee.**

No. 77–1452.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1977.

Decided Feb. 10, 1978.

George F. Hartje, Conway, Ark., for appellants.

Raymond W. Fullerton, Dept. of Agriculture, Washington, D. C., for appellee; Barbara Allen Bobcock, Asst. Atty. Gen., Ronald R. Glancz, Atty., U. S. Dept. of Justice, Washington, D. C., James Michael Kelly, Asst. Gen. Counsel, Raymond W. Fullerton, Director, Litigation Div., Eric Paul, Atty., U. S. Dept. of Agriculture, Washington, D. C., on the brief.

Richard A. Koehler, Livestock Marketing Assn., Kansas City, Mo., for amicus curiae, Livestock Marketing Assn.

Before ROSS, STEPHENSON and WEBSTER, Circuit Judges.

STEPHENSON, Circuit Judge.

This is an appeal from an order of the Secretary of Agriculture establishing commission charges for selling livestock at four auction markets operated by the petitioners in Arkansas. This case arose when petitioners (appellants) filed with the Packers and Stockyards Administration (Administration), an agency of the United States Department of Agriculture (Department), proposed increases in their rates and charges which were to go into effect on February 1, 1976. Petitioners furnished no information in support of the increases when they filed their proposed schedules. The Administration concluded on the basis of the petitioners' annual reports that the proposed rate increases would not be "just, reasonable, and nondiscriminatory" as required by 7 U.S.C. § 206.[1] The Administration filed a separate complaint, order of suspension, and notice of hearing for each petitioner on January 30, 1976, and suspended the operation of the proposed increased rates for 60 days. The hearings were consolidated and held in April 1976 at Little Rock, Arkansas, before an administrative law judge. The decision of the administrative law judge was filed on November 19, 1976, proposing rates higher than recommended by the Administration but different than the petitioners' proposals. Both sides appealed to the Secretary of Agriculture, who referred the matter to the Department of Agriculture's judicial officer, who had been delegated final administrative authority to decide rate cases. The judicial officer, under the authority of 7 U.S.C. § 211,[2] denied petitioners' requested rates and instead prescribed the rates to be charged by the auction markets. *In re Central Arkansas Auction Sale, Inc.*, 36 Agric. Dec. 764 (1977). In this appeal the auction markets raise several issues, including lack of notice and the use of a confiscatory rate making scheme by the Department. For the reasons stated below, we affirm.

*Notice*

Petitioners and the Livestock Marketing Association, *amicus curiae*, argue initially that the rate making scheme used by the

---

1. 7 U.S.C. § 206 provides:

 All rates or charges made for any stockyard services furnished at a stockyard by a stockyard owner or market agency shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate or charge is prohibited and declared to be unlawful.

2. 7 U.S.C. § 211 provides that whenever, after full hearing, the Secretary of Agriculture determines that any rate or charge is or will be unjust, unreasonable, or discriminatory, the Secretary may determine and prescribe what will be the just and reasonable rate or charge.

Administration in the rate making hearing should first have been proposed and adopted in a rule making context. Petitioners contend that they proceeded to the hearing before the administrative law judge under the assumption that the Administration would use the traditional rate of return method for calculating rates. The Administration, however, without notice to the petitioners, used a new method of computation. This, according to the petitioners, violated the dictates of *Hill v. FPC*, 335 F.2d 355 (5th Cir. 1964), and denied them due process.

■ We are not persuaded by petitioners' argument. The Supreme Court has stated that "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). *See City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 323, 458 F.2d 731, 742 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Alabama-Tennessee Natural Gas Co. v. FPC*, 359 F.2d 318, 343 (5th Cir.), *cert. denied*, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). Furthermore, an agency is not precluded from announcing new principles in an adjudicative proceeding. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765–66, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). The crucial inquiry in our opinion is whether petitioners had sufficient notice of the method of computation to be used in the hearing so that they could prepare a case. *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture*, 565 F.2d 321, 326 (5th Cir. 1977). *See Port Terminal R.R. Ass'n v. United States*, 551 F.2d 1336, 1342–43 (5th Cir. 1977).

Turning to the record before us, we note that at the beginning of the rate making hearing on April 1, 1976, counsel for the petitioners notified the administrative law judge that approximately 60 days prior to the hearing he was furnished with a set of proposed tariffs. Only two days prior to the hearing petitioners' counsel was given another set of proposed tariffs which are now at issue. Furthermore, on the day the hearing began petitioners' counsel was provided a copy of *Giles Lowery Stockyards*, 35 Agric.Dec. 267 (1976), which apparently first enunciated the method of computation used by the Administration in the instant case. In light of these developments counsel for the petitioners, with no objection by the government, asked that a continuance be granted following the government's evidence and before presentation of the petitioners' case. This procedure was accepted and a three-week continuance was granted. Although the government was unable to present all its witnesses in the first two days of the hearing and consequently called several additional witnesses at the start of the reconvened hearing, the petitioners voiced no objection. Furthermore, the petitioners did not seek a second continuance following the government's case but rather chose to put on their evidence.

■ Under these circumstances, the petitioners' reliance on *Hill v. FPC*, *supra*, is misplaced. In that case the standards applied by the agency were not announced until the decision, which simultaneously held that the proof was insufficient to make out the prima facie case under them. In the instant case the rate making standards that were ultimately adopted by the Secretary of Agriculture were provided to the petitioners before the three-week continuance and the presentation of their evidence. Furthermore, these standards were fully aired during the hearing and were amenable to rebuttal evidence. Therefore, we conclude that the instant case is clearly distinguishable from the *Hill* case.

■ The better practice in this case would have been to inform petitioners well in advance of the hearing the method to be used by the Administration in analyzing the auction rates. *See Giles Lowery Stockyards, Inc. v. Dep't of Agriculture*, *supra*, 565 F.2d at 325–26. Under the circumstances, however, with the three-week continuance following the furnishing to petitioners' counsel of the *Giles* case, 35 Agric.

Dec. 267 (1976), we are persuaded that petitioners had adequate notice so that they could prepare a case.[3]

### Rate Making Method

Petitioners attack the rate making method used by the Department of Agriculture on several different grounds. First, the petitioners argue that the unit allowance concept relied upon by the Department is defective and will result in erroneous conclusions as to revenue needed by the petitioners. More specifically, the petitioners contend that rather than the unit allowance concept, which takes nationwide averages regarding some categories of expenses and allocates a certain amount to each animal sold, the Department should have utilized a rate base and rate of return formula.

■ Contrary to petitioners' argument, however, a rate making agency is not required to use a single regulatory formula. *Permian Basin Area Rate Cases*, 390 U.S. 747, 776–77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Wisconsin v. FPC,* 373 U.S. 294, 309, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 52 S.Ct. 736, 86 L.Ed. 1037 (1942). Furthermore, when "devising a ratemaking scheme, a regulatory agency can take into account the peculiar characteristics of a particular industry and can choose among various competing theories." *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra,* 565 F.2d at 324; *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 335. Finally, an agency in its discretion may use average costs or allowances [4] rather than the actual cost figure supplied by the utility. *FPC v. Texaco, Inc.,* 417 U.S. 380, 387–88, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974);

*Permian Basin Area Rate Cases, supra,* 390 U.S. at 818–19, 88 S.Ct. 1344; *Tagg Bros. & Moorhead v. United States,* 280 U.S. 420, 440–42, 50 S.Ct. 220, 74 L.Ed. 524 (1930); *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra,* 565 F.2d at 327. We refuse the petitioners' invitation to compel the Department to utilize a rate base and rate of return formula.

Secondly, the petitioners argue that the Department must use the rate of return formula for auction markets because this particular formula is used for terminal stockyards. *See generally Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469 (1937). This argument, however, ignores the distinct difference between the two operations. For example, the owners of large terminal stockyards provide the facilities where livestock are bought and sold and invest millions of dollars in the stockyards. Auction markets are usually small operations with investments generally less than $50,000. The terminal stockyard owners' income depends on the return allowed on their investment in the stockyard. On the other hand, the great majority of auction market owners actively work at their auction markets and a large part of their income is derived from the Department's computed allowance for a working owner. The Department can clearly take into account these differences in determining a rate formula. *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra,* 565 F.2d at 325; *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 335.

■ Thirdly, the petitioners contend that the rate making scheme employed by the Department is confiscatory and unrea-

---

**3.** Petitioners further contend that the Department of Agriculture was required to publish its rate making method under the Freedom of Information Act, 5 U.S.C. § 552. Assuming arguendo that publication was required here, actual knowledge or notice of agency policy precludes reliance on the agency's failure to comply with the publication requirement of the Freedom of Information Act. *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra,* 565 F.2d at 326; *Whelan v. Brinegar,* 538 F.2d 924, 927 (2d Cir. 1976).

**4.** In the instant case the Department accepted without challenge approximately 60% of the expenses claimed by the petitioners. A per animal allowance using nationwide averages was utilized for the following expenses: (1) labor and management performed by owners/officers, (2) return on working capital, (3) bad debts, and (4) business-getting and maintaining expenses.

sonable. In this regard, it has long been recognized that the "power to regulate is not a power to destroy." *Railroad Commission Cases*, 116 U.S. 307, 331, 6 S.Ct. 334, 345, 29 L.Ed. 636 (1886). A reasonable rate is one that is not confiscatory in the constitutional sense. *FPC v. Natural Gas Pipeline Co., supra*, 315 U.S. at 585, 52 S.Ct. 736. On the other hand, "The Secretary is not required to prescribe rates so low as to be barely sufficient to withstand attack on the ground of confiscation, but is at liberty within limits that he may find to be just and reasonable to establish higher rates." *Denver Union Stock Yard Co. v. United States, supra*, 304 U.S. at 483, 58 S.Ct. at 998. *See Banton v. Belt Line Ry.*, 268 U.S. 413, 422–23, 45 S.Ct. 534, 69 L.Ed. 1020 (1925). Additionally, as the Fifth Circuit recently stated, "[A] regulated industry is not entitled, as a matter of right, to realize a particular rate of return, and the interests of the consuming public are also to be considered in establishing rates." *Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra*, 565 F.2d at 324. *See Covington & Lexington Turnpike Co. v. Sandford*, 164 U.S. 578, 596, 17 S.Ct. 198, 41 L.Ed. 560 (1896); *FPC v. Natural Gas Pipeline Co., supra*, 315 U.S. at 606–07, 52 S.Ct. 736 (Black, J., concurring).

Turning to the instant case, the Secretary of Agriculture, under the authority of 7 U.S.C. § 211, may determine and prescribe a just and reasonable rate. Under this type of statutory standard, judicial inquiry is at an end if the total effect of the rate prescribed by the Secretary cannot be said to be unjust and unreasonable. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 33 (1944). "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." *Id. Accord, FPC v. Texaco, Inc., supra*, 417 U.S. at 387–88, 94 S.Ct. 2315; *Wisconsin v. FPC, supra*, 373 U.S. at 309, 83 S.Ct. 1266. Moreover, "he who would upset the rate order * * * carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *FPC v. Hope Natural Gas*

*Co., supra*, 320 U.S. at 602, 64 S.Ct. at 288. *Accord, American Toll Bridge Co. v. Railroad Commission of Calif.*, 307 U.S. 486, 494–95, 59 S.Ct. 948, 83 L.Ed. 1414 (1939).

Following the petitioners' application for increased rates, the Administration began its rate analysis for each auction market. Each stockyard's cost of operation was examined by the base year 1974, which at the time was the most recent year for which the statistics were available. Any expenses which the Administration determined were not properly chargeable to the stockyard were subtracted from the market's claimed expenses. Additionally, four categories of expenses were subtracted by the Administration and replaced by allowances based on nationwide averages. *See* note 4. Finally, additional allowances were made for the auction market's return on buildings, equipment and land and for an operating margin. The total of these figures equaled the auction market's total reasonable revenue requirement.

Following the determination of each market's reasonable revenue requirements for 1974, the receipts which would have been produced under petitioners' proposed increased tariffs were determined. A comparison of these totals led the Administration to conclude that the proposed tariffs were not just, reasonable and nondiscriminatory. Furthermore, a comparison of the market's actual receipts in 1974 led the Administration to conclude that petitioners' existing tariffs were not just, reasonable and nondiscriminatory.

Based on the above findings, the Administration constructed a new per-head weight tariff, as opposed to the petitioners' existing value-based tariff, in an attempt to prescribe a just and reasonable rate. The Department's judicial officer, in reviewing the Administration's rate scheme, concluded that the rate scheme was reasonable and hence not confiscatory. This conclusion was based in part on his comparison of the auction market's revenue requirements for 1974 and the receipts which would be expected in 1976 under the Administration's

rates. The judicial officer's justification for using cost figures of one year and revenue figures of another was stated as follows:

No challenge is made by respondents [auction markets] as to the use of the calendar year 1974 as the base period * * *.

* * * [The Administration] constructed a tariff to produce reasonable rates based on complainant's [Administration's] estimate of the volume to be received by each respondent in calendar year 1976. Here, again, complainant was using the most recent data then available. It is practical and easy to use the most recent volume data, and it is necessary and appropriate to use the most recent volume data because ratemaking looks to the future.

*In re Central Arkansas Auction Sale, Inc.,* *supra,* 36 Agric.Dec. at 824.

Before oral argument, each party was asked to provide this court with their estimate of the revenue which would have been received in 1974 under the tariffs proposed by the Administration. When these figures are compared with the total reasonable revenue requirements of 1974, the estimated revenues fall short of the requirements. However, the government in submitting these figures stated that the estimated receipts were predicated on extrapolations from the petitioners' unaudited data. Furthermore, the government indicated that the unaudited figures were sufficiently imprecise to preclude exact projections. In light of these drawbacks, we do not place great weight on the 1974 projected revenue figures.

In our opinion a problem still exists, however, in comparing revenue requirements in 1974 to expected receipts in 1976. We note that the judicial officer has recognized the potential problem in the following manner:

It is only in the case of litigation that there is a serious time lag between the most recent cost data and the most recent volume data; and this time lag creates no actual problem because during the interval between the filing of the final Decision and Order and the effective date thereof, respondents can easily file applications for increased rates based on more recent data, and the applications will be acted upon by complainant [the Administration] before the effective date of the Order.

*In re Central Arkansas Auction Sale, Inc.,* *supra,* 36 Agric.Dec. at 824.

It is our view petitioners have failed to show with clear and convincing proof that the rates are unreasonably low. In light of the serious time lag between the cost data and the volume data, however, we do not discourage petitioners from filing applications with the Administration for increased rates based on more recent data.[5]

Finally, petitioners attack the Administration's refusal to consider several of the petitioners' reported expense items in determining the reasonable revenue requirements for the auction markets. However, it is not controlling that the method employed to determine the rate contained infirmities with respect to one or more items as long as the total effect of the rate order cannot be said to be unjust and unreasonable. *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. 281; *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 331. Our conclusion that the total effect of the Secretary's rate order cannot be said to be unjust and unreasonable ends further judicial inquiry into the rate making method.

*Judicial Officer Bias*

 Finally, petitioners argue that they were denied due process by the submission of this appeal to a judicial officer whose background was that of an Administration rate maker. In our opinion, however, the fact that the judicial officer has had experience with the regulatory process is not alone a sufficient basis for disqualify-

---

5. The Secretary's order has not yet become effective because of the stay granted by this court pending its review.

ing him from his present function in the agency. Moreover, a preconception about the impropriety of a certain method of calculating rates is not grounds for disqualification. Agency officials are assumed to be capable of judging a particular controversy fairly on the basis of its own circumstances. The petitioners have not made a showing to the contrary. *See Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

*Conclusion*

In summary, we have thoroughly explored the record and carefully examined the Secretary's conclusions. We are convinced that the Secretary's findings are supported by the evidence and proper legal standards have been applied. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Burlington Northern, Inc. v. United States*, 549 F.2d 83, 88–89 (8th Cir. 1977). We are also satisfied that substantial evidence on the record as a whole supports the administrative decision. *See Giles Lowery Stockyards, Inc. v. Dep't of Agriculture, supra*, 565 F.2d at 326–27. Furthermore, we are persuaded that petitioners had sufficient notice of the method of computation to be used in the hearing so that they could prepare their case. Finally, we are persuaded that the effect of the rates contained in the Secretary's order cannot be said to be unjust and unreasonable. Accordingly, the petition to review and set aside the Secretary of Agriculture's order is denied.

ROSS, Circuit Judge, dissenting.

I would grant the petition to review, set aside the Secretary of Agriculture's order and remand to the Secretary with directions to adopt the findings and recommendations of the administrative law judge. In my opinion the figures furnished to us, at the request of the court, show that the rates established by the Secretary are confiscatory, arbitrary and capricious. According to the figures provided by the Secretary, the order provides for *lower* rates than those in effect prior to the requested increase, rather than higher rates proposed by petitioners.