PORT TERMINAL RAILROAD ASSOCI-
ATION et al., Petitioners,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

No. 75–3677.

United States Court of Appeals,
Fifth Circuit.

May 12, 1977.

Rehearing Denied June 8, 1977.

Joe G. Fender, Houston, Tex., for Houston Port Bureau.

Before JONES, WISDOM and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

### I.

The petitioning carriers[1] seek relief from an adverse final order of the Interstate Commerce Commission. The underlying controversy arose when the carriers filed schedules for increased crosstown, intra and inter-terminal, switching rates[2] at Houston, with like charges to apply as minima for line haul movements to, from, or via Houston. On receipt of protests, the Commission suspended the proposed schedules[3] and initiated investigation proceedings.

The proceeding was referred to an administrative law judge, and the carriers were required to file with the Commission and all parties copies of their cost studies by August 22, 1973. A final decision was not rendered until February 10, 1975,[4] ordering cancellation of the rate schedules on the ground the railroads failed to show the proposed rates to be "just and reasonable".[5]

Hugh L. McCulley, Houston, Tex., John J. McKay, Austin, Tex., John P. Legendre, Dallas, Tex., for petitioners.

Hanford O'Hara, Atty., Arthur J. Cerra, Gen. Counsel, ICC, Thomas E. Kauper, Asst. Atty. Gen., Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., for respondents.

1. These carriers are linehaul rail carriers serving Houston, Texas: Southern Pacific Transportation Co.; Missouri Pacific RR Co.; Atchison, Topeka and Santa Fe Railway Co.; Chicago, Rock Island and Pacific RR Co.; Fort Worth and Denver Railway Co.; Missouri-Kansas-Texas RR Co.; and major switching lines at Houston: Port Terminal RR Ass'n; and Houston Belt and Terminal Railway Co.

2. This type of switching includes cars switched from a point of origin to a point of destination within the same terminal area, as distinguished from reciprocal switching which is a movement to or from a connecting linehaul carrier. The proposed charges do not apply to reciprocal switching.

3. The schedules were postponed until December 31, 1973.

4. The Commission did not serve an initial decision or recommended order of the administrative law judge but did order the carriers to keep records of amounts received pursuant to the increases after December 31, 1973.

5. Section 15(7) of the Interstate Commerce Act, 49 U.S.C. § 15(7), provides as follows:

   Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate,

The carriers then filed a petition for reconsideration and further hearing, making an offer of proof, that stayed the rate cancellation. On September 23, 1975, the Commission issued an order refusing reconsideration and further hearing and ordered cancellation of the rates within thirty days. The railroads then perfected this appeal. The Commission granted an application for a stay pending further orders.

## II.

The carriers filed the rate schedules to increase switching charges [6] at Houston, Texas, because of alleged annual losses of approximately $1,200,000. The justification for the increases offered by the carriers was primarily cost-based and a cost study was accordingly introduced as support. The Commission found the study deficient in several respects and held, therefore, that the carriers failed to carry their burden to show the increases were justified. There are no published Commission standards for the methodology of switching studies introduced in rate cases.

The carriers' cost study showed the proposed charges to be about equal to and in some instances less than the carriers' variable switching costs. The Commission had accepted a cost study introduced by the same carriers for increased switching charges at the same Houston terminal based on the same costing methods in *Switching Increases at Houston and Eagle Pass, Texas,* 311 I.C.C. 267 (1960); cf. *Switching Charges at Laredo, Texas,* 311 I.C.C. 31 (1960); *Switching at Corpus Christi, Texas,* 311 I.C.C. 191 (1960). The Commission, however, concluded that closer examination of the study was warranted in light of changed circumstances at the Houston terminal and the close relationship in this case between variable costs and the proposed charges.

The major criticism directed at the carriers' study by the protestants [7] was failure to follow the procedures outlined in Rail Terminal Form F, a formula-based costing

fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after the date this amendatory provision takes effect, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.

Since the approval of the Railroad Revitalization and Regulatory Reform Act of 1976, section 15(7) no longer applies to railroads. Sections 15(8) and (9) are now the applicable sections that alter the scheme of railroad ratemaking. Section 15(7), however, applied at times material to this case.

6. The present increases range between 48.6 and 106.4 percent over the previous rate levels.

7. On November 6, 1975, leave to intervene in this appeal was granted to Houston Port Bureau, Inc., et al. Protestants below, included various shippers and receivers, traffic associations, and civic organizations.

method to determine terminal switching costs. Although the Commission noted Form F is not the only permissible method to compute switching costs, the cost study was found deficient in each instance where it failed to follow Form F procedure.

In particular, the industrial zones set up by the carriers, like those used in *Houston Switching,* were criticized for the fact that the size and breadth of these zones did not permit development of the services performed within each zone for the interstate crosstown cars. The carriers' zones were said to rest on the assumption that each car handled within a zone receives the same type of switching service. The Commission declined to accept this assumption "without detailed proof that there is a basis for doing so—*proof which, in other words, could only result from the type of study within the contemplation of Rail Terminal Form F.*" [8] (Emphasis added.)

> The Commission continued:
>
> [w]hile the use of Rail Terminal Form F is not mandatory, nevertheless its principles are a valid guide to determine the propriety of the methodology used by respondents [carriers] in developing their costs and in setting up their zones for the purpose of the time and motion study.[9]

The carriers' cost study was then found deficient in respect to its formulation of zones, its failure to trace the movement of the 390 interstate switch cars during the test week, and its failure to trace empty rail car movements.[10] These deficiencies more than coincidentally reflect instances of variation from Form F procedure.

The carriers in their petition for reconsideration and further hearing and on this appeal argue that the invocation of Form F or its principles as the standard for determining the reliability of its cost study unfairly deprived them of an opportunity to make their case. They rely on *Houston Switching,* in which a similar cost study was accepted, and they point out that at no time did the Commission suggest cost studies would be tested against Form F procedure. As a consequence of the Commission's invoking an unanticipated standard, the carriers asked to present further evidence to comply with the standard in an effort to vitiate the Commission's doubts as to the merit of the rate increases. The Commission denied this request. This denial and other asserted errors form the subject of this appeal.[11]

### III.

Review of Commission decisions in rate cases is necessarily restricted. These decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." *Manufacturers R. Co. v. United States* (1918), 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831. *See also* 5 U.S.C. § 706(2). As the Supreme Court observed, "[t]he process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforce-

---

8. I & S Docket No. 8863 (Jan. 23, 1975) at 35.

9. *Id.* at 36–37.

10. Although the representativeness of the test week was also questioned, the Commission itself said that "[i]f this were the only deficiency in the study, perhaps it could be overlooked." *Id.* at 40. It is unclear to what extent the carriers treatment of per diem expense influenced the decision, and in light of the fact that most other criticisms were rejected, *see id.* at 39–43, we cannot say the Commission's invocation of Form F as a standard was not prejudicial. 5 U.S.C. § 706.

11. The other points of error are:

1. The application to the carriers' evidence of the standard of proof defined as "clear and convincing";
2. Errors in findings;
3. Errors in conclusions;
4. Failure of the Commission to serve an initial decision and make it a part of the record in this proceeding, and failure to make findings to support the statutory excuse claimed;
5. Failure of the Commission order to be supported by substantial evidence.

In light of our disposition, we need not reach these contentions.

ment of transportation policy to a permanent body and has charged it with the duty of being responsive to the dynamic character of transportation problems." *Board of Trade of Kansas City v. United States* (1942), 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432.

This delegation is however not unbounded. *Atchison, T. & S. F. R. Co. v. Wichita Board of Trade* (1973) 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350. Although "[e]xpert discretion is the lifeblood of the administrative process, . . . 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' " *Aberdeen and Rockfish R. Co. v. United States,* E.D.La. 1967, 270 F.Supp. 695, 710, modified and affirmed, 393 U.S. 87, 89 S.Ct. 280, 21 L.Ed. 219 (1968) and motion to withhold remand denied, E.D.La., 301 F.Supp. 889.

■ This appeal raises difficult problems reflecting the uncertain status of the necessary underpinnings of a fair administrative process. The problem, a hardy perennial in the administrative process, is to reconcile the needs of procedural fairness with the need for full and fair use of whatever expertise the agency may have.[12] While parties should be apprised of the appropriate methods and procedures to be used in presenting their claims in an administrative setting, the agency must be allowed flexibility to adjust standards to deal effectively with varying problems.

The carriers presented a cost study based on the same methodology as the one presented in *Houston Switching.* The protesting parties in that case made criticisms regarding the costing method used there similar to the criticisms made in this case.

The Commission now states that the reason it approved rate increases in *Houston Switching* is that the fully distributed costs far exceeded the proposed charges, and therefore, notwithstanding problems with the carriers' costing methods, the study retained validity as a general guide. This may have been the Commission's reason for accepting the carriers' study in 1960, but a reading of the *Houston Switching* opinion fails to disclose the Commission's acquiescence in any of the protestants' criticisms or any indications that it was using the carriers' cost study only as a general guide. On the contrary, the Commission stated that the cost of handling crosstown switching traffic in Houston was as shown in the railroads' cost study. 311 I.C.C. at 279.[13] It is not surprising, therefore, that the carriers relied on *Houston Switching* in presenting their cost study to support present rate increases, and the Commission so found.[14] Furthermore, the good faith of this reliance has not been challenged.

■ Although a party does not usually have the right to rely on a prior administrative ruling, the totality of circumstances existing in this case make application of the usual rule unnecessarily harsh. Not only did the carriers rely in good faith on the previous Commission decision, but nothing transpired from the time *Houston Switching* was decided until the Commission decision to alert the carriers as to what was expected of them.

In 1970, in Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298,[15] the Commission proposed to adopt certain formulas developed by its cost-finding section including Form F and to accord prima facie validity to evidence developed by application of such formulas. The cost-finding proceeding was initiated

---

12. *See* K. Davis, Administrative Law Treatise, Vol. 2, §§ 17.07, 17.08 (1958); L. Jaffe, Judicial Control of Administrative Action (1965), at 586–589.

13. The results of the cost study are noted in 311 I.C.C. at 272.

14. I & S Docket No. 8863 (Jan. 23, 1975) at 36.

15. The Commission followed prior notice requirements of 5 U.S.C. § 553 in recognition of the fact that vouchsafing the methodology of formula based costing methods has a "substantial" effect on the carriers and that more than a "procedural" change was involved. Section 553 requires publication of Federal Register notice for proposed rulemaking.

by notice of proposed rulemaking.[16] The purpose of the proceeding insofar as it related to the adoption of cost formulas was stated in the Commission interim report as follows:

A primary purpose of this proceeding is to standardize the form of cost presentations or the methods to be employed in estimating future costs. The prima facie validity of a formula in future proceedings would relate strictly to the approved method. A final rule adopting specified formulas would foreclose a party from collaterally attacking those formulas, including their methods and assumptions. The same result should follow whether or not expressly so provided by rule.

Parties in future proceedings would then not be permitted to inquire into the structure and functional relations described by the formulas. However, a witness' selection of a particular formula, including whether he properly exercised his discretion in using, adjusting, or applying it, would be subject to cross-examination. Whether the underlying figures relied upon by the witness are in error would be an obvious subject for inquiry.

This proceeding will not decide whether any particular costs are more valid in certain cases than in others. What is intended is that prima facie validity be given to approved formulas; whether costs derived from other methods may be relied on must await a showing of particular circumstances in individual proceedings.

Under the proposed rule, a party would be free to employ other methods for estimating costs. The burden of going forward with further evidence, and not the burden of proof, is shifted to the opposite party, if the party with the burden of proof uses an approved formula. If the former first uses an approved formula, the burden of going forward shifts to the latter to justify its own method in relation to, or as an improvement upon, the approved method.

A formula given prima facie validity would place no undue burden on a respondent, for a carrier would not be required to use an approved formula. The carrier may be called upon thereafter to explain divergences from formula costs, but, as in present practice, a carrier assumes the burden of making an adequate and representative showing of its costs. Similarly, the prima facie rule would permit a protestant, if the carrier has chosen not to use an approved formula, to use it or not, again depending upon its choice in the matter. If the carrier has chosen to use the formula, the protestant may not attack the formula, as such, but might bring out any impropriety in its use or justify a presentation of other (perhaps more specific) data.

321 I.C.C. 238, 241–242 (1963).

The Commission report of July 13, 1970, however, refused to standardize the cost finding formulas of the Commission or to accord prima facie validity to evidence developed by application of the formula. The Commission found that "[a]pproval and adoption of specific cost formulas, [including Form F] with a view toward giving prima facie validity to formula based costs are not shown to be necessary or desirable", 337 I.C.C. at 326–27.

█ There is generally no requirement that the agency proceed by rule rather than by adjudication and perhaps in these circumstances the failure to adopt rules that would provide "safe harbors" of sorts reflects the sagacity of an expert body all too familiar with the endless variety of problems with which it must deal. As the Supreme Court said in *Securities and Exchange Commission v. Chenery Corp. et al.,* 1947, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995,

The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized

---

**16.** The notice was published on April 28, 1962, 27 FR 4102.

problems which arise. [Footnotes omitted.] Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. [Footnotes omitted.] [17]

■ The Commission's discretion in determining how to proceed, whether by rule or by adjudication, does not, however, necessarily provide immunization for its failure to alert parties as to the prevailing procedural standards, especially when the failure to give sufficient notice of these sorts of standards can be easily remedied. From the time of the Commission decision in Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 238

(1970), when terminal Form F was accorded no higher status than other costing methods until its decision below, there is nothing affording notice that interstate switching rate cost studies would be judged by Form F principles.

■ The Commission does not argue to the contrary. Instead, it takes the position that the standard by which cost studies are judged is not Form F but "whether the [cost] study is inherently reliable for the purposes for which it is advanced". The problem with this position is that Form F was used as the standard against which the study was judged, although perhaps meticulous adherence to Form F was not mandated. Furthermore, the labeling of the standard as one of "reliability" does not belie the fact that it is the standard in operation that is relevant to the carriers. The operational standard in this instance was whether there was adherence to the principles of Form F. It is this methodological standard as to which the carriers should have had notice. Particularly is this true where Form F requires an expensive, time consuming procedure. Indeed, "inherently reliable" connotes more of a standard of proof than a standard of methodology for a cost study.

In sum, the carriers relied on *Houston Switching* as a firm indication of the reliability of their costing methods. The Commission's reasons for reexamining the costing methods are unclear, and the purported underlying bases for its reexamination were certainly not obvious. There was no warning therefore to the carriers that the Commission might change its previous position. See Part IV of this opinion. The Commission in a rulemaking proceeding rejected preferred status for formula-based costing techniques. There was nothing subsequent to the rulemaking proceeding that would show Form F to be a measuring stick against which other studies would be judged. Despite these facts, the Commis-

---

**17.** *Cf. City of Chicago et al. v. FPC et al.,* 1967, 128 U.S.App.D.C. 107, 385 F.2d 629; *New Castle County Airport Commission v. CAB,* 1966, 125 U.S.App.D.C. 268, 371 F.2d 733; *Aberdeen and Rockfish Railroad Co. et al. v. United States et al.,* E.D.La., 1967, 270 F.Supp. 695.

sion rejected the carriers' cost study primarily on the basis of failure to follow Form F. In these circumstances, it cannot be said that the carriers knew what sort of measurement of their switching costs would be deemed appropriate for consideration by the agency.

In *Matlack, Inc. v. United States*, E.D.Pa. 1954, 119 F.Supp. 617, a large tank truck carrier applied for a certificate of public convenience and necessity. The Commission rejected the application on the ground that the testimony was too general and speculative and did not specifically name the needed service, a ruling that was contrary to the Commission's prior practice. The court said:

> It was as clear to the Commission as it is clear to us that Matlack in presenting its application relied upon the previous actions of the Commission in applications of this nature as to the manner in which it presented the application and the quantity and quality of the testimony adduced.

119 F.Supp. at 621. The court then acknowledged the right of the Commission to change policies, but said:

> However, where as here, an applicant relying in good faith upon previously determined standards, as expressed in previous written statements or conclusions of the agencies, acts in strict accordance with such standards, such applicant should not be precluded from an opportunity to meet the revised standards if, without notice, the agency determines upon new and perhaps more sensitive standards. This is all the more true where, as here, the applicant has stated in writing and unequivocally that it is in a position to meet such revised standards by competent evidence, if allowed the opportunity to do so.

*Id.* at 622. The court, therefore, found the Commission's refusal to permit reconsideration and rehearing improper and remanded to the Commission for further proceedings.

*Cf. Eddleman v. United States*, D.Colo.1964, 229 F.Supp. 231; *Ringsby Truck Lines, Inc. v. United States*, D.Colo.1967, 263 F.Supp. 552, appeal dismissed as moot, 1968, 389 U.S. 576, 88 S.Ct. 689, 19 L.Ed.2d 775, appealed later 10th Cir. 1973, 490 F.2d 620, *cert. denied*, 1974, 419 U.S. 833, 95 S.Ct. 59, 42 L.Ed.2d 59; *see also City of Lawrence, Mass. v. C. A. B.*, 1 Cir. 1965, 343 F.2d 583. Although the case now before us presents a somewhat different situation, the reasoning in *Matlack* is persuasive, for the question is not simply whether the agency departed from a well defined standard of presentation as was the case in *Matlack* but whether in light of all the circumstances, the parties were apprised of the standard by which they were judged. "Certainly when carriers appear before the Commission, they are entitled to know by what standards they are going to be judged." *Ringsby Truck Lines Inc.*, 263 F.Supp. at 554. The Commission itself has stated, "in fairness, standards should not be changed without due notice." General Increase-Transcontinental, 319 I.C.C. 792, 803 (1963).

### IV.

This is not the typical situation where the agency has a reasonably well defined standard from which it departs without giving prior notice. The situation here unhappily is more complex. The purported standard by which the Commission judges cost studies is simply "reliability". It has not been made clear to us that the "reliability" standard has been developed through the adjudicatory process to a point where carriers seeking rate increases know what methodology will be found acceptable nor what criticisms they are likely to encounter.[18] In substance, the problem permeating this controversy is the vagueness of the standard by which cost studies are judged. This problem was exacerbated in the present context by the earlier proceeding on which the carriers relied.[19]

---

18. An effort was made to ascertain to what extent the reliability standard has been developed through the adjudicating process in our request for supplemental briefs. The Commission simply repeated that "reliability" was the standard and not Form F.

19. It should also be noted that the carriers submitted their cost study to the Commission prior to the hearing, and no objections were made regarding their costing method.

We are at a loss to understand what the Commission expects and the reasons therefor. The bases for the Commission's departure from its prior ruling were: [20] first, that circumstances have changed in the Houston switching district in the intervening years and second, that in *Houston Switching* the proposed charges were substantially below fully distributed costs, whereas variable costs were nearly equal to the proposed increases in the present case.

As to the first, the Commission stated: The long period of time elapsing since then [*Houston Switching*], and the changes that have occurred in the interval, such as increases in traffic volumes, decreases in crosstown switching, changes in car availability and utilization, additions and improvements to facilities, and increases in car sizes, justify further examination of these studies and contentions.[21]

The Commission did not articulate, and it is unclear to us what relationship exists between these facts and the reliability of the carriers' costing methods. An articulated connection between the facts found and the conclusion reached is necessary so that we may understand what the Commission did and why.

The Commission's second basis for its departure from its earlier ruling is equally cryptic. We are uncertain why *fully distributed costs* exceeding proposed increases in *Houston Switching* justified use of the carrier's methods but the fact that *variable costs* bore a close relationship to the proposed increases justified scrutiny in this case. Had the Commission noted a close relationship between fully distributed costs

and the proposed increases here, we could understand the reason for departure. The Commission, however, relied on variable costs as a basis for distinction, despite evidence of and a further offer of proof that fully distributed costs did exceed the proposed rates. We are consequently left in doubt as to the basis of the Commission's departure from its prior ruling, and certainly none of these factors suggested by the Commission would have put the carriers on notice that they should not rely on *Houston Switching*.

What we have said shows that the Commission misplaces its reliance on *Atchison, T. & S. F. Ry. Co. v. Wichita Board of Trade*, 1973, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350, for the proposition that even if the carriers did not have notice of the standard, it is sufficient for the agency merely to articulate the reasons for the establishment of the new standard.[22] To begin with, even if the proposition were correct, as previously noted, the Commission's explanation for departure was unsatisfactory. Furthermore, the problem here is not simply departure from a prior norm but also a standard that because of its vagueness fails to give notice of how to present one's case to the agency. Finally, the basis of decision in *Wichita Board of Trade* was that the failure to articulate reasons precluded effective judicial review. The reviewing court knew neither what the agency had done nor why and thus could not determine whether the agency was acting in accordance with the will of Congress. That the articulation of reasons for agency departure from prior norms is a necessary precondition of judicial review does not metamorphose the statement of those reasons into a sufficient an-

---

**20.** The Commission stated an additional specific reason for rejecting the carriers' zone formulation. The Commission noted that the prior case proceeded on the assumption that average costs there understated the costs of switching intra and inter-terminal cars, an assumption that the Commission felt was no longer valid. It is difficult to know to what extent this fact influenced the Commission's ultimate determination in the rate increase, in general, and the treatment of zone formulation in particular. In any event, our position is not significantly in-

fluenced by this more clearly reasoned basis for departure from the prior ruling.

**21.** I & S Docket No. 8863 (Jan. 23, 1975) at 31.

**22.** In fact, it is somewhat unclear what position is taken by the Commission in that they concede in *their supplemental brief that prior no-tice of the standard by which one is judged is required.*

swer to all problems. The notice problem is one of independent significance and its res- · olution depends on whether the unfairness inherent in the imposition of an unanticipated standard of this kind without notice is outweighed by other factors. See Part V of this opinion.

## V.

Although the Commission's decision not to grant reconsideration and further hearing is seldom disturbed by a reviewing court, we must do so when the Commission has abused its discretion.[23] The circumstances relating to the introduction and rejection of the carriers' cost study convince us that the carriers were not ap-. prised of the standard by which they would be judged. Determination by the Commission as to whether rate increases are cost-justified should be based to the extent possible on the merits. That what may be justifiable rate increases are denied because of methodological deficiencies caused by insufficient guidance is inconsistent with the regulatory scheme. Regulated companies are entitled to compensatory rates, and it is important, therefore, that it is known what costing methods are acceptable.

In this case we are not faced with the unhappy alternatives presented to the *Chenery* Court. The issue there was whether a new rule developed in an adjudicatory setting could be given retroactive effect, that is, whether the rule could be applied in the case in which it was developed. The Court said that the "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." 332 U.S. at 203, 67 S.Ct. at 1581. A choice

had to be made. Either the agency would be permitted to apply the law in a manner consistent with its interpretation of statutory objectives or the party subjected to the new rule would prevail on its reliance claim. In the instant case both the statutory policy and reliance claims can be given effect, because the Commission has not yet been properly presented with the merits of the carriers' case. The Commission may impose sensitive standards without prior notice, thereby fulfilling statutory objectives, and the notice difficulties can be remedied in large part by allowing a further hearing where additional evidence, including a new study if necessary and a reasonable time therefor, can be presented.

There is cost in the process. The cost is primarily in efficiency, that is, a pro tanto frustration of the policy of finality in administrative proceedings. The problems this case presents, however, admit of no easy solution. Ideally, the Commission should set guidelines for costing methods that reasonably apprise parties of acceptable techniques or perhaps create safe harbor methods that although not made mandatory could be vouchsafed from serious methodological criticism. An analogue to the safe harbor was considered in the 1971 rulemaking proceeding and rejected. Perhaps the development of costing techniques has not reached a point where the suggested route is possible or desirable. If not, the consequence should not be denial to parties of an opportunity to present the merits of their case, particularly where a further hearing can mitigate the effect of imprecision in the standard.

In this case, considering all the circumstances, it is evident that the carriers did not know what was expected of them at the hearing. We therefore fail to understand the reason for the Commission's re-

---

**23.** That the decision whether to reopen a proceeding is committed to the Commission's discretion and is reviewable only to determine whether there has been an abuse of discretion is a well-settled principle. *Ford Truck Lines, Inc. v. United States*, W.D.Tenn.1975, 394 F.Supp. 577, 580; *Watkins Motor Lines v. Unit-*

*ed States*, D.Nebr.1965, 243 F.Supp. 436, 443; *Colorado-Arizona-California Express, Inc. v. United States*, D.Colo.1963, 224 F.Supp. 894, 902; *The Bowman Transportation Co. v. Arkansas-Best Freight*, 1974, 419 U.S. 281, 294– 96, 95 S.Ct. 438, 42 L.Ed.2d 447; *see also* 5 U.S.C. § 706(2)(A).

fusal to permit a further hearing, and we hold that this refusal was improper.

Certainly numerous difficulties inhere in the additional hearing due to the lapse in time since the proposed charges went into effect. A new study may also be necessary that will raise still further problems. Commission sensitivity to these difficulties is necessary in order that a merit-based decision can be reached.

The order of the Interstate Commerce Commission is set aside and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered.