GILES LOWERY STOCKYARDS, INC.
d/b/a Lufkin Livestock
Exchange, Petitioner,

v.

DEPARTMENT OF AGRICULTURE,
Respondent.

No. 76–2462.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1977.

---

Robert L. Flournoy, Lufkin, Tex., for petitioner.

Richard A. Koehler, C. T. Tad Sanders, William B. Deas, John C. Augustine, Kansas City, Mo., for amicus curiae.

Thomas C. Heinz, Eric Paul, Gen. Counsel, Dept. of Agriculture, Edward H. Levi, U. S. Atty. Gen., U. S. Dept. of Justice, Raymond W. Fullerton, Atty., U. S. Dept. of Agriculture, Edwin E. Huddleson, III, William Kanter, Attys. Appellate Section, Civ. Div., Dept. of Justice, James Michael Kelly, Asst. Gen. Counsel, U. S. Dept. of Justice, Raymond W. Fullerton, Director, Lit. Div., U. S. Dept. of Agriculture, Washington D. C., for respondent.

Before THORNBERRY, Circuit Judge, SKELTON, Senior Judge *, and HILL, Circuit Judge.

THORNBERRY, Circuit Judge:

This is an appeal from an Order of the Department of Agriculture establishing rates and charges for the petitioner, a corporation that operates the Lufkin Livestock Exchange at Lufkin, Texas. The Exchange is an "auction market" at which producers' livestock is sold on a commission basis.

The case arose when petitioner sought permission to increase its charges to farmers and ranchers for selling their livestock. The Packers and Stockyards Act requires that all rates or charges made by a stockyard owner or operator be "just, reasonable, and nondiscriminatory." 7 U.S.C. § 206.[1] The Act also provides that whenever, after full hearing, the Secretary of Agriculture determines that any rate or charge is or will be unjust, unreasonable, or discriminatory, the Secretary may determine and prescribe reasonable rates or charges. 7 U.S.C. § 211. Final administrative authority to decide rate cases under the Act has been delegated to the Department of Agriculture's judicial officer, who in this case denied the requested rates and instead adopted a rate schedule proposed by the Department. *Giles Lowery Stockyards*, 35 A.D. 267 (1976).

This appeal followed, and petitioner and the Livestock Marketing Association,

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. There is no doubt that the Act applies to petitioner's operation. In 1958, following extensive hearings, Congress extended the Act's regulatory provisions to auction stockyards, regardless of size. *See* Senate Rep. No. 1048, 85th Congress, 1st Sess. (1958). There are approximately 2,000 such stockyards operating today, and this is apparently the first case involving ratemaking for these "auction markets." As the judicial officer noted in his decision, this case "will serve as a guide for the Department's rate policy. . . ." 35 A.D. at 282.

*amicus curiae,* raise three broad issues before this court: (1) whether the ratemaking scheme employed by the Department is confiscatory in violation of the fifth amendment; (2) whether petitioner had adequate notice of the procedures to be utilized in the ratemaking process; and (3) whether substantial evidence on the record as a whole supports the administrative decision.[2] For the reasons stated below, we affirm.

## I. Ratemaking Method

Petitioner contends that the ratemaking scheme used by the Department does not insure a reasonable rate of return and complains that the method is deficient because it does not consider petitioner's investment in the business.

 It is elementary that no rate is reasonable that is confiscatory. *See Railroad Commission Cases,* 116 U.S. 307, 6 S.Ct. 334, 388, 29 L.Ed. 636 (1886). However, there exists a "zone of reasonableness within which [an agency] is free to fix a rate varying in amount and higher than a confiscatory rate . . . ." *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). Moreover, no single method of ratemaking is required; rather, "it is the result reached, not the method employed, which is controlling. . . . It is not theory but the impact of the rate order which counts." *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). *Accord: Wisconsin v. FPC,* 373 U.S. 294, 309, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); *FPC v. Texaco, Inc.,* 417 U.S. 380, 387–88, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

 When Congress has directed that rates be regulated but has not specified a method for doing so, the agency has discretion in devising a particular scheme. *Permian Basin Rate Cases,* 390 U.S. 747, 776–77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Wisconsin v. FPC, supra,* 373 U.S. at 309, 83 S.Ct. 1266. If the total effect of a rate order cannot be said to be unjust and unreasonable, judicial inquiry is at an end, and it is unimportant that the method employed to reach that result contained infirmities. *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. 281; *Alabama-Tennessee Natural Gas Co. v. FPC,* 359 F.2d 318, 331 (5 Cir.), *cert. denied,* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). In devising a ratemaking scheme, a regulatory agency can take into account the peculiar characteristics of a particular industry and can choose among various competing theories. *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 335. Finally, a regulated industry is not entitled, as a matter of right, to realize a particular rate of return, and the interests of the consuming public are also to be considered in establishing rates. *Covington & Lexington Turnpike Co. v. Sandford,* 164 U.S. 578, 596, 17 S.Ct. 198, 41 L.Ed. 560 (1896); *FPC v. Natural Gas Pipeline Co., supra,* 315 U.S. at 606–07, 62 S.Ct. 736 (Black, J., concurring).

 These principles make clear that this court must first consider whether the result reached by the Department in the instant case is reasonable. If so, our inquiry is at an end and there is no need to examine the ratemaking scheme itself.[3] A party attacking a prescribed rate schedule must show with clear and convincing proof that the rates are unreasonably low. In the

---

2. At oral argument petitioner also pointed to possible bias on the part of the judicial officer who issued the administrative decision. Petitioner did not raise this issue in its brief and offered nothing in support of its charge of bias. It is sufficient for us to note that absent a showing to the contrary, agency officials are assumed capable of judging a controversy fairly and without bias or prejudice. *Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). *See also Hortonville Joint School Dist. v. Hortonville Educ. Ass'n,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

3. Petitioner focuses its attack on the ratemaking formula, arguing that the Department should have utilized a rate base and rate of return formula. Petitioner specifically complains of the Department's "unit allowance" concept, which takes nationwide averages regarding expenses and allocates a certain amount to each animal sold. This approach is also referred to as a "per-head-weight" schedule and is used by approximately 800 of the nation's 2,000 auction markets.

absence of such proof, the courts will not find a fifth amendment violation. *American Toll Bridge Co. v. Railroad Comm'n,* 307 U.S. 486, 494–95, 59 S.Ct. 948, 83 L.Ed. 1414 (1939); *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. 281. Petitioner has failed to carry this rather heavy burden.[4]

■ Finally, petitioner urges that the same method must be used for computing rates for auction stockyards as for terminal stockyards, *i. e.,* a rate base/rate of return formula. *See generally Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469 (1938); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936). There is a great deal of difference between the two types of operations,[5] and the Department clearly can take into account these differences in determining a rate formula to apply. *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 335.

## II. Notice

■ Petitioner first contends that the method of computation utilized in the ratemaking proceeding should have been first proposed and adopted by the Department in a rulemaking context. However, the choice between rulemaking and an ad hoc proceeding to determine policy lies within the discretion of the administrative agency. *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1974); *Alabama-Tennessee Natural Gas Co. v. FPC, supra,* 359 F.2d at 343. Moreover, an agency may announce new principles in an adjudicatory proceeding and need not resort to rulemaking. *NLRB v. Bell Aerospace So.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). *See also Port Terminal R.R. Ass'n v. United States,* 551 F.2d 1336, 1341–42 (5 Cir. 1977).

■ Petitioner, however, urges that it was prejudiced because the Department failed to make known, prior to the hearing, the method of computation it intended to utilize. Petitioner relies heavily on *Hill v. FPC,* 335 F.2d 355 (5 Cir. 1964), which requires that a public utility be sufficiently apprised of the standards that will be applied to determine a reasonable rate in order that the utility may adequately prepare its case. *See also Port Terminal R.R. Ass'n v. United States, supra,* 551 F.2d at 1342–43.

The Department informed petitioner's counsel by letter, well in advance of the hearing, of the "method used by the Packers and Stockyards Administration to analyze auction rates." Enclosed with the letter was a 15-page document outlining that method, as well as a financial analysis of Lufkin Livestock for rate purposes. *See* Exhibit 1, Record (vol. 1); Exhibit 10, Record (vol. 4). Petitioner was thus aware of

---

4. The rates approved by the Department will produce nearly $185,000 annually, this providing petitioner with approximately $48,600 more than reasonable expenses and depreciation. Of this amount, about $6,500 was allowed as a reasonable return on land, equipment, buildings, and working capital. For purposes of comparison, the judicial officer computed a "rate base" using accepted public utility principles and arrived at a figure of approximately $58,300, of which $6,500 would be slightly more than 11 per cent. That rate of return is considerably higher than the 8 per cent frequently used in other regulated industries.

5. Terminal stockyards have been traditionally located at major railroad centers and are the "throat through which the current [of livestock] flows." *Stafford v. Wallace,* 258 U.S. 495, 516, 42 S.Ct. 397, 66 L.Ed. 735 (1922). Owners of a terminal stockyard provide the facilities where livestock are bought and sold, while the selling function is performed by independent market agencies. The owners' entire income thus depends upon the return allowed on their investment. Auction markets, on the other hand, are generally small operations located in cattle-producing areas. Most are owner operated, with the owner performing the sales function. In this respect, the owner-operator is in much the same position as the independent market agency at a terminal stockyard. Finally, terminal stockyards ordinarily operate in monopolistic settings, while it is not unusual to find several auction markets within a few miles of one another. The judicial officer compared terminal stockyards to such "traditional" public utilities as railroads and electric companies, and likened auction markets to owner-operated taxicabs. 35 A.D. at 283.

the ratemaking approach, was aware that the Department planned to apply it in this case, and was presented with opportunity to build a case around the method or attack its application. The case is unlike both *Hill* and *Port Terminal R.R. Ass'n, supra,* in which the aggrieved parties had no such notice or opportunity.

The fact that this particular ratemaking method was not formally adopted by the Department until the judicial officer's decision in this particular case is irrelevant, since an agency can adopt such policies via adjudication as well as by rulemaking. The critical inquiry is whether petitioner had notice of the method so that it could prepare a case, and there is no doubt that petitioner had such notice. Nor is it relevant that petitioner, relying on cases involving terminal stockyards, chose to build its case on rate base principles, because petitioner had notice that another formula was to be utilized.

■■■ Petitioner also advances a Freedom of Information Act argument to the effect that the Department was required to publish its ratemaking method. *See* 5 U.S.C. § 552(a)(1)(D).[6] This publication requirement applies only to an agency's "substantive rules of general applicability" and "statements of general policy," and the ratemaking formula at issue here did not achieve such status until the administrative decision in this case was handed down. Prior to that time, the method was merely a position or proposal, and, as such, was avail-

able upon request under 5 U.S.C. § 552(a)(2)(C).[7] That portion of the FOIA, however, does not mandate publication,[8] and petitioner apparently made no request for the information. Moreover, we re-emphasize that petitioner had actual notice of the ratemaking method, and even if publication were required here, actual knowledge or notice of agency policy precludes reliance on the agency's failure to comply with the FOIA's publication requirement. *Whelan v. Brinegar,* 538 F.2d 924, 927 (2d Cir. 1976); *Kessler v. FCC,* 117 U.S.App. D.C. 130, 147, 326 F.2d 673, 690 (1963).

### III. Substantial Evidence

■■■ Petitioner also raises the almost-obligatory "substantial evidence" challenge: whether substantial evidence on the record as a whole supports the administrative decision. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). A presumption of validity is accorded to administrative bodies acting within their sphere of expertise, *ICC v. Jersey City,* 322 U.S. 503, 512, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944), and an agency has considerable discretion in determining just and reasonable rates. *TNT Tariff Agents, Inc. v. ICC,* 525 F.2d 1089, 1093 (2d Cir. 1975). We cannot substitute our judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and we have in the past noted that our

---

**6.** This subsection provides:

 Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—. . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency . . . ..

**7.** This subsection provides:

 Each agency, in accordance with published rules, shall make available for public inspection and copying—. . . administrative staff manuals and instructions to staff that affect a member of the public . . . ..

**8.** In fact, it is unclear whether the method must *now* be published in the Federal Register. Professor Davis has suggested that some, but not

all, adjudicatory opinions must be published. K. Davis, Administrative Law Treatise § 3A.7 (Supp.1970). The Attorney General's *Memorandum on the Public Information Section of the Administrative Procedure Act* (1967) takes the position that no statement of policy in an adjudicatory opinion need be published. Under this view, administrative "case law" is available under subsection (2)(A), which requires agencies to make available for public inspection and copying "final orders . . . made in the adjudication of cases." *See Memorandum, supra,* at 10. As Professor Davis later pointed out, "time goes on without a clarification." K. Davis, Administrative Law of the Seventies § 3A.7, at 73 (1976). This case does not present us with the opportunity to provide any guidance in this muddled area.

review of the exercise of agency authority is confined "by the narrow perimeter of the substantial evidence rule." *Colonial Stores, Inc. v. FTC,* 450 F.2d 733, 739 (5 Cir. 1971). Applying these principles, we find no merit to petitioner's argument and conclude that the judicial officer's exhaustive 54-page opinion finding the Department's proposed rates just and reasonable is supported by substantial evidence. The agency has clearly set forth the grounds on which it acted, *Atchison, T. & S. F. R. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), and has taken a "hard look" at the issues and problems. *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (1970).

■ In the context of this case, a substantial evidence attack is merely another means by which petitioner can challenge the Department's ratemaking method. Indeed, petitioner emphasizes that various "allowances" based on nationwide industry studies—rather than actual figures provided by petitioner—were utilized in the rate calculations.[9] Use of such allowances or averages is clearly within the agency's discretion. The "just and reasonable" principle does not require "that the cost of each company be ascertained and its rates fixed with respect to its own costs." *FPC v. Texaco, Inc., supra,* 417 U.S. at 387, 94 S.Ct. at 2321. It is permissible for an agency to use average costs rather than the costs of individual utilities. *Permian Basin Area Rate Cases, supra,* 390 U.S. at 818–19, 88 S.Ct. 1344. *Southern Louisiana Area Rate Cases v. FPC,* 428 F.2d 407, 432 (5 Cir.), *cert. denied,* 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970). *See also Tagg Bros. & Moorhead v. United States,* 280 U.S. 420, 440–42, 50 S.Ct. 220, 74 L.Ed. 524 (1930). To require an agency to rely only upon figures supplied by a utility would encourage the company to inflate its actual expenses in order to obtain higher rates and

to engage in imprudent business practices while secure in the knowledge that such losses would be absorbed by the consumer. *See United Gas Public Service Co. v. Texas,* 303 U.S. 123, 150–51, 58 S.Ct. 483, 82 L.Ed. 702 (1938) (Black, J., concurring).

The administrative decision is AFFIRMED.

---

**9.** For example, although petitioner claimed bad debt losses of more than $4,400 during the year in question, the Department used $2,700, a figure reached by taking .03 per cent of the gross value of livestock sold during the particular year. This allowance is utilized even though an auction market experienced no bad debt losses during the year. The formula was determined after a study of the ratio between bad debts and gross sales at auction markets across the country.