**JIGC NURSING HOME COMPANY, INC., d/b/a Jewish Institute for Geriatric Care, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

No. 86 C 1349.

United States District Court, E.D. New York.

Aug. 24, 1987.

Summit Rovins & Feldesman, New York City (Ira G. Greenberg, of counsel), Hogan & Hartson, Washington, D.C. (William A. Bradford, Jr., Robert F. Liebenluft and Sue A. Kaplan, of counsel), for plaintiff.

Andrew J. Maloney, U.S. Atty., Brooklyn, N.Y. (Anne E. Stanley, Asst. U.S. Atty., of counsel), Office of the General Counsel, Dept. of Health and Human Services, Washington, D.C. (Robert E. Robertson, Gen. Counsel, Terry Coleman, Principal Deputy Gen. Counsel, Gerard Keating, and Donald Dickey, Law Clerk, of counsel), for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, a 527-bed voluntary not-for-profit skilled nursing facility, brings this action under 42 U.S.C. § 1395oo (f) to review a final decision by defendant denying plaintiff reimbursement for the years 1980, 1981 and 1982 of certain inpatient routine costs and costs of laundering patients' personal clothing. Plaintiff now moves for summary judgment on the three-volume administrative record filed with the court. Defendant cross-moves to dismiss or for summary judgment on the administrative record.

### I. Statutory and Regulatory Background

This case arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, which established the Medicare program. Specifically, the case concerns Part A of the Act, under which the federal government reimburses hospitals, nursing facilities and home health agencies for the "reasonable cost" of covered services provided to Medicare beneficiaries. 42 U.S.C. §§ 1395c–1395i–2; 1395f(b)(1); 1395x(v)(1)(A).

Plaintiff is a skilled nursing facility, defined as an institution or distinct part of an institution primarily engaged in providing inpatients with skilled nursing care and related services or rehabilitation services for persons who are injured, sick or disabled. 42 U.S.C. § 1395x(j)(1). Pursuant to the statute, such a facility obtains reimbursement by dealing with an agency known as a "fiscal intermediary" acting as the Secretary's agent. 42 U.S.C. § 1395h. Plaintiff's intermediary is Blue Cross/Blue Shield of Greater New York ("Blue Cross").

The Medicare statute excludes from any coverage items and services "which constitute personal comfort items." 42 U.S.C. § 1395y(a)(6). Accordingly, the Secretary's regulations state that among the services excluded from Medicare coverage are "personal comfort services.... The use of a television set or a telephone are examples of personal comfort services." 42 C.F.R. § 405.310(j)(1985).

"Reasonable cost" for which Medicare provides reimbursement is defined in 42 U.S.C. § 1395x(v)(1)(A), providing, in pertinent part, that:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included.... Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such reg-

ulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals ... will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

Thus this provision as amended in 1972 defines "reasonable cost" as actually incurred costs less those unnecessary in the efficient delivery of health services. The Secretary may by regulation establish cost limits for items and services to be recognized as reasonable. The Secretary is required to provide in the regulations for "suitable retroactive corrective adjustments" for "a provider" in "any fiscal period" whose reimbursement under such methods as cost limit analysis "proves to be either inadequate or excessive."

Pursuant to the 1972 amendments, the Secretary in 1974 promulgated a regulation providing that the Health Care Financing Administration ("the agency") of the Department of Health and Human Services might establish cost limits governing reimbursement to skilled nursing facilities and other Medicare health care providers. 42 C.F.R. § 405.460 (1985), *redesignated as* 42 C.F.R. 413.30 (51 Fed.Reg. 34,790, 34,800–2 (September 30, 1986)). The regulation further provided, in pertinent part, that

Limits established under this section may be adjusted upward for a provider [under specified circumstances].... An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identi-

fied by the provider, and verified by the intermediary [if] ... (1) The provider can show that: (i) The actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and (ii) The atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

42 C.F.R. 405.460(f) (1985).

## II. Facts

On August 31, 1979 the agency for the first time established "limits" on the adjusted skilled nursing facility inpatient routine service costs reimbursable under Medicare. 44 Fed.Reg. 51,542 (1979). The limits applied to the cost reporting period beginning on or after October 1979, *id.*, and therefore affected plaintiff's 1980 costs. Plaintiff's reported costs for 1980 were $75.99 per diem while the cost "limit" applicable to it was $58.17 per diem.

Plaintiff asserts without contradiction by defendant that it specializes in the rehabilitation of recently hospitalized, acutely ill, old patients. In making admissions plaintiff gives priority to patients having conditions requiring short-term active care and seeks to stabilize them and help them achieve independence so that they can be discharged to their homes or to institutions providing less intensive care. Plaintiff enjoys a national reputation in rehabilitative therapy.

New patients, who are often referred by neighboring hospitals, reside in a special unit and receive concentrated medical evaluation and care by a multidisciplinary team. Most Medicare days occur in these units. Plaintiff has had remarkable success in rehabilitating geriatric patients with lower extremity amputations and in treating those with hip fractures. Plaintiff has also successfully controlled urinary incontinence without using indwelling catheters.

Unlike other facilities, plaintiff treats non-rehabilitated patients having episodes of acute illness at the nursing home whenever possible rather than transferring them to hospitals. Plaintiff also has a program to evaluate and when possible rehabilitate terminally ill patients so that they can return to their homes in the last weeks or months of their lives.

By letter dated December 23, 1980 to Blue Cross, plaintiff requested an exception to the cost limit, citing its "unique character" as confirmed by an extensive assessment conducted by the New York State Department of Health. Administrative Record (hereinafter referred to as "A.R.") at 716. Blue Cross responded on February 20, 1981 that the federal agency had instructed it to prepare a "peer group comparison" for "appellant providers" and analyze significant per diem variances. A.R. at 723. Accordingly, Blue Cross had compared plaintiff with ten other nursing homes located in New York City, Westchester and Putnam Counties using 1978 data. A.R. at 725–28.

The comparison showed that plaintiff exceeded the average costs of the ten nursing homes in four areas or "cost centers," namely, administrative and general, operation of plant, interns and residents, and dietary. (Blue Cross did not note that plaintiff's total excess cost center expenses over the peer groups' was only $6.26, compared with the $17.82 gap between plaintiff's costs and the cost limit.) Blue Cross requested that plaintiff supply a "detailed narrative" explaining its excess costs over the peer group. A.R. at 723.

Plaintiff responded with a detailed submission to Blue Cross dated March 27, 1981. A.R. at 730. Plaintiff noted that its number of Medicare days was far greater than the peer group average, requiring more intense care for these acutely ill patients and thus higher costs. A.R. at 734–35. Plaintiff further showed that while it admitted more acutely ill patients than other long-term facilities for the elderly, most discharged patients returned to their own home or that of a relative, and far fewer patients were transferred to acute care hospitals from plaintiff than from other long-term facilities. Plaintiff stated, that due to its goal of rehabilitation rather than long-term maintenance, its services were atypical. A.R. at 736–37.

Plaintiff explained that its higher dietary costs resulted from additional labor and more expensive food required to operate a kosher kitchen, as well as plaintiff's physical design. A.R. at 739–42. It attributed higher intern and resident cost to the fact that unlike any member of the peer group, plaintiff operated an approved training and education program for graduate physicians, allowing it to provide extensive medical services at substantial savings compared with the cost of fully salaried staff physicians. A.R. at 743–44. Plaintiff attributed its higher plant operation costs to its unusual facility design and its higher administrative and general costs to its active admission and discharge program, unionization, and the large number of activities and services it maintained. A.R. at 744–50. See A.R. at 751–66.

On August 5, 1981 Blue Cross submitted its recommendation to the agency. A.R. at 768. Blue Cross noted that although its original peer comparison was based on 1978 costs, "at your department's request we revised our peer comparison to include only 1979 audited cost and statistical data," resulting in a finding that plaintiff exceeded the new peer group costs in its administrative and general, employee health and welfare, interns and residents, dietary, social service and pharmacy cost centers, this time by quite different amounts. A.R. at 771. Although it did not say so, Blue Cross was told by the agency months earlier that "[a]s a rule of thumb any variance of less than 150% of a peer group norm for individual cost centers will not be questioned." A.R. at 1226.

Blue Cross advised the agency that it believed plaintiff had adequately proved that it rendered more intensive medical and rehabilitative services to a more acutely ill patient population, and cited statistics to support this conclusion. A.R. at 769–71. Blue Cross asserted plaintiff's excess costs were justified and recommended an excep-

tion for the full amount by which plaintiff's costs exceeded those of the peer group in 1980 and a continuation of this exception into the 1981 reporting period. A.R. at 771–72.

Blue Cross again failed to note that because the peer group consisting of the ten nursing homes it used exceeded the cost limit, the recommendation that plaintiff get full relief for its costs over the peer group necessarily left plaintiff unreimbursed for the substantial amount by which the peer group itself exceeded the cost limit. On August 24, 1981 plaintiff sent a letter to Blue Cross noting this flaw in Blue Cross' methodology, but the record does not disclose any response. A.R. at 793.

The agency responded on December 15, 1981 to the Blue Cross recommendation. A.R. at 795. It agreed that plaintiff was entitled to an exception for the cost of "atypical nursing services." However, the agency did not use Blue Cross' peer group calculations. It relied on a comparison of plaintiff's nursing hours per day with nursing hours per patient day reported in a survey by Hospital Administrative Services for the 6–month period ending June 30, 1979. A.R. at 795–96. The agency denied requests for exceptions for plaintiff's employee health and welfare, dietary, pharmacy and social services cost centers. In its discussion of plaintiff's dietary costs, the agency stated it had compared plaintiff's raw food cost with that of a "peer group of providers with routine per diem cost just above or below the routine cost limit." A.R. at 796. The agency did not identify this peer group. The agency did authorize Blue Cross to recalculate exception amounts for plaintiff's administrative and general and its medical education costs. A.R. at 797.

On December 30, 1981 Blue Cross notified plaintiff of the agency's decision. A.R. at 805. Plaintiff's counsel apparently then communicated directly with the agency, and on August 11, 1982 the agency sent a letter responding to counsel's requests for further data on how the cost limit broke down into cost centers and on nursing hours per patient day provided by skilled nursing facilities. A.R. at 817.

The letter stated that the cost "limit" was determined by using Medicare cost reports available as of January 31, 1979, "projected forward" to the middle of the cost reporting period starting October 1, 1979. The cost limit was calculated at 115% of average per diem cost of all "in the cell." The agency said the cost limit was not based on the sum of costs from individual cost centers, but that it had "recently extracted" average per diem costs of all general service cost centers by using cost reports available as of November 15, 1981, projecting this cost data "to a future period," deflating the result by inflation since 1980, and adjusting.

The agency did not specify how many cost reports had been used or from whom they had been obtained. It did not explain why the total of average per diem costs for general service centers was $43.00 as opposed to the $58.17 cost limit applied to plaintiff in 1980. The agency also did not state whether it used cost reports from the same sources in arriving at its original cost limits as opposed to its "extracted" cost center limits or explain why it used data from different years in making these calculations.

The agency letter also stated that average nursing hours per day furnished by "16 facilities just above and below 115 percent of the average for the cell" were 3.13. The agency added that "the results of a recently completed study of 561 freestanding" skilled nursing facilities showed a figure of 3.224. A.R. at 818. The agency did not specify what "the cell" was or indicate whether it was still using data from the Hospital Administration Services survey. It did not state what skilled nursing facilities were among the 561 in its recent survey. It did not break down these average nursing hours per day into those for registered nurses, licensed practical nurses and aides, although it had previously done so to calculate plaintiff's atypical nursing service costs. *Cf.* A.R. at 801.

On December 10, 1982 plaintiff's counsel sent a detailed submission to the agency

and requested an additional meeting. A.R. at 824. Plaintiff's cover letter noted that the agency had conceded that the Hospital Administration Services survey was inadequate because the survey's data was deficient and because it was unrelated to the derivation of the cost limits. The agency had further conceded the inadequacy of Blue Cross' peer group analysis but had not developed a satisfactory alternative. The letter observed that:

The crux of the problem is that [the agency] has not defined a standard for the scope and cost of "typical" services. Consequently, we do not know what method or data will be acceptable to [the agency] for determining and measuring the range of "atypical" services and the necessary costs generated by such "atypical" services. [The agency] asserts that we have the burden of proof on this issue, but does not provide any guidance or benchmarks, other than the cost limit itself, to indicate what it is we are to prove or what documentation or argumentation will be persuasive.

A.R. at 826.

In preparation for the proposed meeting, plaintiff compared data on the average cost center amounts supplied by the agency with its own cost center amounts and attempted to justify its variance from the cost center limits. A.R. at 830. Plaintiff noted, however, that these amounts were "rough estimates." A.R. at 828. The comparison indicated that plaintiff's largest excesses over the average cost center figures included direct cost, employee health and welfare, administrative and general, housekeeping and laundry, and maintenance and central supplies. A.R. at 830.

In explaining its cost center figures, plaintiff noted that it places heavy emphasis on rehabilitation and "has an extraordinary reputation" in New York for successful rehabilitation and discharge of patients, resulting in a high rate of referrals. Plaintiff compared itself with the 1977 National Nursing Home Survey, noting that far more of its patients were from acute care hospitals, and more were discharged to their own home or that of a relative. A.R.

at 831. Plaintiff further observed that most of its Medicare patient days were attributable to its admitting units, which provided concentrated medical assessment and care, and from which most Medicare patients were discharged directly to their homes. A.R. at 832.

Plaintiff noted that its direct cost cost center represented all basic nursing care, which included teaching patients and families self-care, treating and rehabilitating a large post-amputation, fracture and stroke population, repositioning and treating an exceptionally large number of patients with decubitis ulcers, treating severely and acutely ill patients that other facilities would typically transfer to a hospital, and rehabilitating incontinent patients. A.R. at 832–35.

Plaintiff explained that its higher employee health and welfare costs were attributable to statutorily mandated benefits, a collective bargaining agreement arrived at by a league in which plaintiff had little or no ability to exert influence, and the fact that the 1980 cost limits did not include fringe benefits in the labor component and wage index. A.R. at 836–39. Plaintiff stated that its higher housekeeping and laundry costs were caused by its greater discharges per bed of short-stay patients, its emphasis on rehabilitation, ambulation and daily activities, and its policy of training incontinent patients rather than using a catheter, all of which required more cleaning. A.R. at 839–40. Plaintiff attributed its higher pharmacy and central supply costs to the fact it had more acutely and severely ill patients, requiring more use of antibiotic dressings, orthotics and other devices for amputees and post-surgical patients, medications for symptomatic infections, prophylactic antibiotics for pacemaker patients, hip prosthesis, and chemotherapy for neoplasms and cardiotonics for heart decompensation and hypertension. Plaintiff noted its patient population, because less stable, required more frequent changes in medication, adding to the cost of material and labor. A.R. at 841–42.

Plaintiff noted in its cover letter that it had not provided a detailed analysis of the

data supplied to it by the agency on average nursing hours per day. Plaintiff explained that it questioned the derivation of that information, "including unexplained omissions or selectivity in the sample of homes used" and that in any event the data did not provide a useful basis of comparison absent an explanation of how these hours were allocable among registered nurses, licensed practical nurses and aides. Plaintiff stated its services typically required more concentration of registered nurses' hours, but that it could not quantify this without an adequate standard of comparison. A.R. at 829.

The agency responded on April 22, 1983, by informing plaintiff its "next step" was to appeal to the Provider Reimbursement Review Board ("the Board"). A.R. at 844. The agency conceded that it viewed its data from its survey of "561 urban, freestanding" skilled nursing facilities as "more reliable" in measuring nursing hours per day than the Hospital Administrative Service survey. *Id.* However, the agency refused to consider recalculating its exception for plaintiff's excess direct nursing costs, on the ground that its methodology, which relied on the Hospital Administrative Service survey, adequately reimbursed plaintiff for its 1980 costs. A.R. at 846. The agency did not respond to plaintiff's criticism of its failure to allocate average nursing hour per day data between registered nurses, licensed practical nurses and aides.

The agency stated there was "no support" for an exception for plaintiff's housekeeping and laundry costs, on the ground that the average length of stay at plaintiff's facility was 539.8 days, "as compared to an average length of stay for all urban, freestanding [skilled nursing facilities] of 280 days." *Id.* The agency did not explain the source of this comparative data, nor did it explain why it disregarded Blue Cross' earlier submission analyzing plaintiff's length of stay statistics. *See* A.R. at 769–771. Blue Cross had noted that only a small number of plaintiff's patients had a long length of stay, and that most of plaintiff's discharges for reasons other than death were of patients with a length of stay of less than six months, of which more than 50 percent were returned to their homes or those of relatives.

The agency went on to compare plaintiff's housekeeping and laundry costs to "the average unadjusted per diem cost of five facilities that have an average length of stay of less than 60 days." But the agency did not identify these facilities or provide any further information about them. A.R. at 846. Similarly, the agency said that although plaintiff had indicated it furnished "atypical ancillary services," its ancillary costs were slightly lower than those for "peer providers." The agency did not identify these peer providers or specifically what ancillary services they provided. A.R. at 846–47.

The agency noted that plaintiff claimed higher pharmacy and central supply costs based on its census of more acutely and severely ill patients and the high rate of admission and discharge for amputees and other post-surgical patients, but concluded that "no data have been given to support these contentions." A.R. at 847. The agency did not indicate why Blue Cross' earlier submission, A.R. at 768, which apparently included plaintiff's medical record department annual report, A.R. at 755, did not provide adequate data to support plaintiff's claims.

The agency did grant plaintiff a partial exception for its 1980 employee health and welfare costs, because the 1980 cost limit did not adequately account for fringe benefits and because plaintiff had entered a new employee contract that year. The agency refused to grant an exception based on "statutorily required benefits," which it asserted were "paid on a similar basis" by other facilities and represented in the cost limit, although it did not explain the basis for this assertion. The agency similarly indicated that the fact plaintiff belonged to a joint negotiating group did not "absolve" it from responsibility for the effect of the labor agreement on its costs. A.R. at 847. The agency perhaps made the curious assumption that one nursing home would have more bargaining power with a union than several nursing homes and hospitals acting together.

In calculating the employee health and welfare exception, the agency said it "computed the average direct per diem cost and the employee health and welfare cost as of December 31, 1980 for urban, freestanding" skilled nursing facilities. Again, the agency did not identify these facilities or provide any further information about them. It then used plaintiff's statutorily mandated benefit costs in 1980 to calculate "the average mandated benefits represented in the cost limit," without explaining why plaintiff's figures equaled the amount of mandated benefits in the limit. After subtracting the resulting benefit figure from average employee health and welfare cost to determine cost attributable to union benefits built into the limit, the agency granted an exception for the difference between this figure and plaintiff's union benefit costs. A.R. at 848.

The agency's letter to plaintiff stressed that plaintiff had the burden of proving it was entitled to an exception to the cost limits, and opined that the previous data the agency had provided on the cost center breakdown of the overall cost limit served a sufficient "benchmark" for plaintiff. A.R. at 845. The agency did not respond to plaintiff's comments about the agency's failure to provide a standard to determine the scope and cost of typical services.

### III. Proceedings Before the Board

Plaintiff meanwhile had on June 24, 1982 requested a hearing before the Board. A.R. at 2758. Between the time of the request and the time of the hearing, discussions and discovery between the parties continued. A.R. at 2725, 2489.

In a revealing document submitted as an appendix to plaintiff's position paper before the Board, plaintiff analyzed correspondence between the agency and fiscal intermediaries regarding forty-eight skilled nursing facilities which requested exceptions to the cost limits. A.R. at 1340. Plaintiff obtained the information on which the analysis was based through a Freedom of Information Act request. The analysis stated that the agency used inconsistent peer groups from one exception request to the next. Sometimes it used a geographic peer group, sometimes a peer group from a different state, sometimes a group of 200 unidentified skilled nursing facilities, sometimes a study of 1600 unidentified skilled nursing facilities, and at least once a study of 1847 free standing urban providers. A.R. at 1341–42.

The agency generally used a peer group different from that recommended by the intermediary. A.R. at 1342. Often, the agency compared one provider to a multitude of peer groups. A.R. at 1343. At times the agency determined atypical nursing cost by using data from the Hospital Administrative Services survey, while at other times it used the 1977 National Nursing Home Survey or a group of 561 skilled nursing facilities or some other group. A.R. at 1343–44.

For only one request did the agency break down the cost limit into cost centers other than nursing services. A.R. at 1344–45. The agency granted few exceptions in any cost center other than nursing, and those instances were confined to the cost centers of dietary, nursing administration, administrative and general and once, housekeeping, although the cost limit includes a total of 13 routine cost centers. A.R. at 1344–50.

Documents obtained by plaintiff similarly indicated that the agency "never" granted exceptions for maintenance and repairs, housekeeping, or central supply cost centers, and that relief for these cost centers as well as administrative and general would likely be "nominal at best." A.R. at 1255–56, 1258.

Before the Board plaintiff challenged the agency's failure to provide exceptions to its excesses over the cost limits in 1980, 1981 and 1982. See A.R. at 457–79, 716–862. It also appealed Blue Cross' denial of reimbursement for the costs plaintiff incurred in laundering patients' personal clothing. The Board assumed jurisdiction on May 20, 1985, A.R. at 523, and held a 2–day hearing commencing July 10, 1985. A.R. at 138–437. During the hearing, Blue Cross' attorney indicated additional relief for plain-

tiff's kosher dietary costs recently had been approved. A.R. at 159.

Plaintiff presented witnesses and voluminous written evidence. The evidence showed that plaintiff specialized in rehabilitation of acutely ill geriatric patients, and enjoyed a national reputation in geriatric rehabilitation. Plaintiff compared itself with New York State data and information from the 1977 National Nursing Home Survey to demonstrate its patients had special needs and required atypical services, causing higher costs. Plaintiff showed that it had been compared with a variety of inconsistent peer groups by the intermediary and the agency. In response, the agency pointed out that plaintiff had received a variety of exceptions from the cost limit, and argued plaintiff had received a very full opportunity to make its case.

The Board found in a decision dated July 10, 1985, A.R. at 99, that both Blue Cross and the agency had failed to provide plaintiff with instructions and direction to determine where its higher costs were incurred. Plaintiff had nevertheless attempted to justify the various cost centers in which it might have incurred higher costs, and provided extensive documentation regarding other cost centers. A.R. at 105–06. The Board noted that Blue Cross, although concluding for all three years at issue the plaintiff was efficient, used a methodology for figuring exception amounts that made it mathematically impossible for plaintiff to justify full relief. A.R. at 106. The Board found that the agency had completely ignored Blue Cross' conclusion that plaintiff was efficient, and "relied on the routine cost limits as conclusive indicia of efficiency ... refus[ing] to provide any relief from the routine ceilings other than limited amounts based on [the agency's] own unreliable and inconsistent peer group comparisons." *Id.* The Board also found that "the evidence and unrebutted testimony clearly demonstrated that the care provided at the [plaintiff's] facility is extraordinary." A.R. at 105.

The Board concluded that cost limits were intended as a presumption of the routine service costs needed to care for pa-

tients in the average skilled nursing facility. In this case, no one disagreed that plaintiff was not an average facility. Accordingly, it was necessary to go beyond the routine cost limits and look more closely at the plaintiff's actual costs. As plaintiff had accepted and borne, without rebuttal, its burden of showing these actual costs were reasonable and necessary in efficiently delivering needed health care, the Board concluded plaintiff should be given full relief from the routine cost ceilings. A.R. at 106–07.

The Board further found that plaintiff's personal laundry patient service constituted "personal comfort items" and that this expense was not reimbursable. Therefore, it affirmed Blue Cross' determination on this issue. A.R. at 107.

### IV. Proceedings Before the Acting Deputy Administrator

On January 13, 1986 Blue Cross requested that the Administrator review the Board's decision. A.R. at 95. The agency, plaintiff and Blue Cross all provided submissions. On February 24, 1986 the Acting Deputy Administrator of the agency reversed the Board's decisions that plaintiff should be given full relief from the cost ceilings for 1980, 1981 and 1982. A.R. at 3. He found that the Board had apparently reversed the usual burden of proof in observing that the intermediary had not indicated where plaintiff's costs were out of line. To the contrary, he said, it was the plaintiff's burden to specify the atypical costs incurred because of the special needs of its patients, and show these costs were reasonable, attributable to the circumstances specified, and separately identified. A.R. at 5.

The Deputy Administrator stated that the cost limits "were based on 112% of the average per diem labor-related and non-labor costs of each comparison group. In addition other adjustments were made to the cost limit to reflect local cost conditions." A.R. at 6. He did not specify the "comparison groups" used or what "other adjustments" were made, but purported to hold that the plaintiff had an adequate

opportunity to obtain the peer group and cost limit information it desired. A.R. at 7. The Deputy Administrator stated that "[i]t is not feasible for the Intermediary to conduct an audit so detailed that it can identify each inefficiency of the [plaintiff]" and thus the burden was on plaintiff to identify specific areas where it incurred excess costs but where an exception had not been granted or expressly denied. A.R. at 6. Since plaintiff had not done so, the Deputy Administrator found it was not entitled to any further exceptions. A.R. at 8. Moreover, since "the cost of furnishing patients' personal laundry service is not allowable," the Deputy Administrator affirmed the Board on that issue. *Id.*

## V. Discussion

### A. Plaintiff's Entitlement to Exception from Routine Cost Limits for 1980, 1981 and 1982

The Secretary points out that on this appeal pursuant to 42 U.S.C. § 1395oo(f)(1), the court's standard of review is limited to determining if the Secretary's decision is arbitrary and capricious or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A) and (E). However, an agency must give a reasoned explanation of its decision to enable the court to review the administrative determination, prevent arbitrary action, and inform the aggrieved party of the ground relied on so the party can plan a course of action. *Matlovich v. Secretary of the Air Force,* 591 F.2d 852, 856–57 (D.C.Cir.1978). An agency cannot employ a standard so vague that it fails to give notice of how to present one's case. *Port Terminal Railroad Association v. United States,* 551 F.2d 1336, 1343–44 (5th Cir.1977).

The Acting Deputy Administrator's decision is couched in such terms as to make it impossible to review. He opined that the plaintiff's contention of extraordinary care entitling it to a full exemption from the cost limits was "groundless," A.R. at 6, but failed to explain why plaintiff's evidence was inadequate. The Deputy Administrator noted that the cost limits for skilled nursing facilities in 1981 were based on 112% of the costs "of each comparison group" and stated plaintiff had received an exception increasing its limit "well above the average per diem of its group," *id.,* yet provided this court with no clue as to the "groups" to which he referred. He concluded that the plaintiff had not "specifically identified additional excess atypical costs ... other than those specifically granted or expressly denied," A.R. at 8, and therefore had not carried its burden of proof. But he did not articulate why "specifically granted or expressly denied" exceptions were not subject to his review or how plaintiff was to identify additional excess atypical costs without any specification of the typical costs of "groups" to which it was compared. It is a mystery to this court how the Acting Deputy Administrator could hold that plaintiff failed to carry its burden of proof without specifying the standard against which it was expected to prove itself.

Although the agency did not designate the standard which plaintiff must meet, this court does not find the Board's alternative proper. After finding there was "no disagreement" that the provider was not an average skilled nursing facility, the Board concluded it was "necessary to go beyond the routine cost limits, and look more closely at the [plaintiff's] actual costs" and that plaintiff had adduced unrebutted evidence that its costs were reasonable and necessary. A.R. at 106–07. The Board's approach is not consistent with the statutory scheme.

One way to determine whether a provider is delivering necessary health services in an efficient way is to examine in detail only that provider's activities and make an individual and objective determination as to each activity. But to require a detailed audit, perhaps even a time and motion study, of each function of each provider would be so costly as to be impractical. Congress therefore provided in 42 U.S.C. § 1395x(v)(1)(A) that the Secretary might use more flexible means to determine "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of need-

ed health services." Thus, the Secretary had the authority to provide by regulation for "limits," presumptively reasonable and subject to an upward adjustment for services "atypical" in nature and scope as "compared" to the services generally furnished by "providers similarly classified." 42 C.F.R. § 405.460 (1985), *redesignated as* 42 C.F.R. § 413.30 (51 Fed.Reg. 34,790, 34,-800-2 (September 30, 1986)).

In other words Congress authorized a determination of reasonable costs by the comparison of a provider applying for upward adjustments with other providers who carry on activities fairly similar to those in which the applicant engages. This court does not read 42 U.S.C. § 1395x(v)(1)(A) to require anything different. That phrase recites that the Secretary's regulations shall provide for retroactive adjustments where "for a provider" the "aggregate reimbursement produced by the methods of determining costs proves to be ... inadequate." To take that language to mean that each provider's reimbursement must be evaluated individually and without reference to the costs of other similar providers would render meaningless the balance of the section.

The Board similarly appears to have erred in failing to focus on plaintiff's various cost centers and in applying its ruling to the institution as a whole. In authorizing the Secretary to establish limits "on the direct or indirect overall incurred costs or incurred costs *of specific items or services or groups of items or services* to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services," 42 U.S.C. § 1395x(v)(1)(A) (emphasis supplied), Congress contemplated that the Secretary could make use of cost center analysis to determine the reasonableness of costs. The Secretary thus provided for the determination of cost "limits" based on cost centers, 42 C.F.R. § 405.460(a)(2) (1985) and required classing of providers such as skilled nursing facilities into groups in order to establish cost limits, 42 C.F.R. § 405.460(b) (1985). The Secretary has followed the statutory provision requiring "suitable retroactive adjustments" for "a

provider" in "any fiscal period," by providing for reimbursement of the cost of "atypical" items or services in excess of the cost limit. 42 C.F.R. § 405.460(f)(1). That regulation requires reference to cost centers and peer groups in determining such "atypical" costs because it specifies that the provider must show its "items or services" are atypical "compared to the items or services generally furnished by providers similarly classified." 42 C.F.R. § 405.460(f)(1) (1985).

In light of the Secretary's explicit regulations for reimbursement of atypical costs, this case is thus not one where the Secretary purports conclusively to establish by setting cost limits what costs are reasonable. *See Regents of the University of California v. Heckler,* 771 F.2d 1182 (9th Cir.1985). *See also St. Paul-Ramsey Medical Center v. Bowen,* 816 F.2d 417 (8th Cir.1987) (where regulatory exception unavailable for cost year under review court orders Secretary to retroactively apply a later cost limit adjustment); *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663 (2d Cir.1973) (Secretary ordered to promulgate regulations providing for retroactive cost limit adjustment).

Where, as here, a plaintiff can claim entitlement to an existing exception to the cost limits, the statute allows the Secretary to require that the plaintiff prove the reasonableness of its costs on a cost center basis in comparison to an appropriate peer group.

Although the legislation permits a determination of reasonable costs by comparison with appropriate peer groups, those groups must render such services as are fairly comparable, and an applicant must have a fair chance to compare itself with them. Obviously, then it must know the composition of that peer group and know or have an opportunity to find out the activities in which the members are engaging. To keep secret the identity of the members of the peer group is to play a shell game.

The Acting Deputy Administrator did not set forth the standard to which plaintiff was compared. Conceivably he meant to

incorporate the reasoning in the administrative proceedings that preceded the Board's determination. Blue Cross, as the Secretary's agent, twice compared plaintiff to peer groups whose routine costs were themselves well above the cost limit. Although Blue Cross recommended full relief to plaintiff for its costs in excess of the peer groups' costs, it disregarded the gap between the cost limit and the costs of the peer groups. Therefore its methodology made it mathematically impossible for plaintiff to obtain reimbursement for the amount of the gap.

Blue Cross also used a different peer group comparison than the one previously disclosed to plaintiff in Blue Cross' final recommendation to the agency, thus changing considerably its findings as to the cost centers in which plaintiff had incurred excess costs and as to the amount of those excess costs. Apparently Blue Cross did not give plaintiff any opportunity to respond to its new findings before it submitted its recommendation to the agency. By using comparison peer groups so as to make full relief from the cost limits impossible and by relying on a second peer group comparison which was evidently not disclosed to plaintiff in time for response, Blue Cross made an irrational if not arbitrary determination.

When it reviewed Blue Cross's recommendations, the agency used an entirely different peer group from the Hospital Administrative Services survey to analyze plaintiff's atypical nursing costs. The agency thereafter conceded that data from this survey contained "flaws." A.R. at 91, cf. A.R. at 1228–41. The agency has since utilized data from 561 free standing skilled nursing homes' cost reports to determine nursing hours per patient day for cost years after 1980, on the ground they are "representative of the data source used in the derivation of the cost limits." A.R. at 844. However, the total agency survey encompassed 2,372 cost reports from urban freestanding skilled nursing facilities, of which 1,811 were not used in the nursing hour data base because they did not furnish required data or "the data did not meet the parameter of furnishing at least 1.5 hours of nursing service per patient day." A.R. at 92.

The agency did not explain what "parameter" caused it to eliminate cost reports showing lower hours per day of nursing nor did it respond to plaintiff's request that nursing hours per day be broken down into those for registered nurses, licensed practical nurses and aides so it could compare its nursing costs. A.R. at 829. Most importantly, the Hospital Administrative Services survey data bore no relation to the cost limits, and the agency has never explained how, if at all, the figures from the 561 nursing homes are relevant to the cost limits.

The court therefore cannot tell how differences between plaintiff's nursing hours per day and those derived from these two surveys explain how plaintiff's nursing costs exceed those included in the cost limits. Without knowing how it differs from the cost limits, plaintiff obviously cannot explain its higher nursing costs or know if it has obtained full relief for its atypical nursing expenses.

The agency originally denied plaintiff's request and Blue Cross' recommendation for an exception for dietary costs. It said it had compared plaintiff's raw food costs with that of a "peer group" but did not identify this group or say if its members operated kosher kitchens. Later, during the hearing, the agency's lawyer said the agency had approved an exception for plaintiff's dietary costs. The submissions to the Deputy Administrator do not confirm this assertion. If an exception was granted, the record does not disclose how it was calculated.

The agency commented that some of plaintiff's department costs should be allocated to "ancillary." A.R. at 810. The agency later referred again to "ancillary services" but said plaintiff's ancillary costs were not unusual. A.R. at 846–47. The Secretary's brief at page 7 defines ancillary service costs as "e.g. physical, occupational and speech therapy, prescription drugs and medical supplies" but also notes at n.*, page 2, that skilled nursing facility services

generally include, among other things, "therapeutic services, drugs, supplies, equipment and . . . other services."

The court cannot divine, and the record does not disclose, exactly what services the agency generally views as "ancillary" rather than routine costs subject to the routine cost limits and specifically which of plaintiff's costs it thinks are ancillary. Without further definition of the term plaintiff can hardly know which costs should be allocated to ancillary cost centers or how its ancillary costs compare with a peer group's. Further, the agency did not say what peer group it used to obtain "average ancillary per diem cost," A.R. at 847. It is also hard to see how the agency can simultaneously conclude that plaintiff is understating its ancillary costs and that its ancillary costs are less than average ancillary costs.

Eventually the agency did give plaintiff a breakdown by cost center of the cost limit. A.R. at 817–22. Without saying how many cost reports it used or from whom it obtained them, the agency said it had "extracted" average per diem costs by projecting 1981 cost reports to an unspecified "future period," deflating to account for inflation and adjusting "for a December 31, 1980 year end." The resulting total of average per diem costs did not correspond with the cost limit figure applied to plaintiff. However, plaintiff nevertheless prepared a detailed submission to explain its costs in excess of these derived cost center figures.

In its response to plaintiff, the agency refused to recalculate an exception for plaintiff's excess nursing costs although its previous calculation of the exception was based on the Hospital Administrative Services survey, not the derived direct cost center figure. In declining to grant an exception for plaintiff's excess housekeeping and laundry costs, the agency relied on plaintiff's average length of stay without considering Blue Cross' previous analysis of plaintiff's length of stay statistics, indicating plaintiff discharged a large number of patients during the year and that only a small percentage of plaintiff's patient population had very long lengths of stay. The agency compared plaintiff's laundry and housekeeping costs with that of five unidentified facilities and ignored plaintiff's evidence on its treatment of a large number of incontinent patients and its use of floor space to accommodate ambulation and other rehabilitation activities.

The agency declined to grant plaintiff an exception for its pharmacy and central supply costs on the ground plaintiff had not provided data on its census of more acutely ill and severely ill patients and its high rate of admission and discharges. Inexplicably it did not consider plaintiff's medical department report submitted with Blue Cross' conclusions in support of these contentions. The Acting Deputy Administrator later failed to discuss the abundant evidence plaintiff put before the Board on these issues. The agency also opined again that plaintiff had underallocated "ancillary" pharmacy and central supply costs. A.R. at 847.

The agency also made puzzling comments on plaintiff's request for an exception for employee health and welfare excess costs. It stated that "statutorily required benefits" such as worker's compensation, FICA and unemployment insurance "are paid on a similar basis by other skilled nursing facilities and are represented in the cost limit." *Id.* The court notes that required benefits such as worker's compensation and unemployment insurance seem likely to differ from state to state. In any event, when the agency actually calculated the exception for plaintiff, it used plaintiff's own figures for the mandated benefits plaintiff paid in 1980 to figure how much of the cost limit was attributable to "average mandated benefits." In essence, the agency compared plaintiff to itself by simply assuming its statutorily mandated costs were identical to the benefits amount purportedly already included in the cost limit.

To try to review the agency's handling of plaintiff's exception requests is akin to wrestling with water. The agency disregarded the intermediary's recommendations and its own instructions to Blue Cross. A.R. at 807–15, 1226. It used in-

962

consistent peer groups and undisclosed peer groups. It relied on them without any explanation of their relevance to the cost limits. It disregarded evidence from plaintiff about its services and patients. The agency criticized plaintiff for misallocating costs without explaining what should be reallocated. It used a nearly incomprehensible calculation to break down the cost limit into cost centers, and then cavalierly dismissed plaintiff's detailed efforts to explain itself against that breakdown. It mostly ignored plaintiff's criticism of the peer group comparisons on which the agency relied.

The record leads the court to wonder about the agency's good faith in applying the cost limit exception for atypical services, particularly in light of the record evidence of the similar manner in which it has treated many other facilities making such exception requests. A.R. at 1340, 1255, 1258.

If plaintiff is to have a fair opportunity to present its exception requests pursuant to the statute and regulations, and if the court is to have a determination it can review, the Secretary must make clear the precise standard to which plaintiff must compare itself. The identity and composition of the peer groups that establish that standard must be revealed, and plaintiff must have the opportunity to determine the precise services and activities in which the members of the groups engage. If the group's costs themselves exceed the cost limit, plaintiff must have an opportunity to explain itself against the gap between the group's costs and the cost limit.

Furthermore, the groups must be used consistently in assessing plaintiff's claims for exceptions. If plaintiff is to be compared to the cost centers of the groups, the Secretary must make it possible for plaintiff to identify the services rendered in the cost centers to which it is to be compared. Plaintiff cannot assess where and why its costs are higher than the norm without knowing or being able to ascertain the "normal" costs for each cost center. The court similarly cannot fulfill its responsibility to review without such information.

Plainly where information about the identity of peer group members, their cost center levels, their patient mix and services, and the derivation of the cost limit, is all solely in the Secretary's possession, the plaintiff can make no meaningful comparison with the peer group costs. In short, both plaintiff and the court must know the standard to which the Secretary holds the plaintiff.

**B. The Secretary's Denial of Reimbursement for Plaintiff's Personal Laundry Expenses**

■ The Secretary denied reimbursement of plaintiff's expenses for personal laundry of its patients' clothing pursuant to 42 U.S.C. § 1395y(a)(6) and 42 C.F.R. § 405.310(j) (1985) on the ground that this service is a "personal comfort item." The Secretary now contends that the court lacks jurisdiction to review this issue under 42 U.S.C. § 1395oo(g)(1) and that the affected Medicare beneficiaries, as opposed to plaintiff, should instead raise the claim before Blue Cross. Every court which has considered this argument has rejected it, on the ground that to accept it would give the Secretary unbridled discretion to prevent reimbursement through regulations. *E.g., Fairview Deaconess Hospital v. Heckler,* 749 F.2d 1256, 1257–59 (8th Cir.1984); *Memorial Hospital v. Heckler,* 706 F.2d 1130 (11th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

Although 42 U.S.C. § 1395oo(g)(1) prohibits judicial review of "[t]he finding of a fiscal intermediary" that no payment may be made for expenses for items or services because "such items or services are listed in section 1395y," this language clearly does not empower intermediaries to interpret what Congress meant when it referred to "personal comfort items." Neither the statute nor the Secretary's regulations define the term to include personal laundry expense. The court has not found and the parties have not cited any case so interpreting the statute or regulations. Plainly it is the function of this court, not Blue Cross, to ascertain if the Secretary has appropri-

ately applied the "personal comfort" exclusion to personal laundry costs.

■ The Secretary argues that to be covered, a service "must bear a very close relationship to the particular medical therapy indicated for the Medicare patient." He asserts that exclusion of personal laundry expense is reasonable because, as the agency explained in a 1982 letter, Medicare patients typically have a short length of stay which renders such services not "medically necessary" as part of routine care.

Conceivably personal laundry services for short-stay Medicare patients undergoing intensive care is often unnecessary to recovery, and it does not detract significantly from their care to require them to wear hospital gowns or similar institutional garb. However, skilled nursing care is defined by the statute to include rehabilitation services. Plaintiff adduced abundant evidence that it concentrates services for its seriously ill Medicare patients to rehabilitate them for return to their homes or to those of relatives. Plaintiff says it devotes 108 beds to intensive rehabilitation, which account for over 95% of its Medicare inpatient days.

Plaintiff also produced substantial amounts of evidence indicating that the ability of such a patient to wear his or her own clothing serves a vital role in the rehabilitation process. Plaintiff points out that for patients who are recovering from strokes or amputations, learning to dress is most important to rehabilitation. Plaintiff also adduced evidence that a patient's ability to wear his own clothes is vital in treating psychiatric disorders. A.R. at 1330, 212–14.

The Secretary analogizes plaintiff's arguments to those made in cases challenging the Secretary's denial of coverage for in-room patient telephone costs, and points out that the courts have upheld his judgment that telephone costs should not be covered. *E.g. Arlington Hospital v. Heckler*, 731 F.2d 171 (4th Cir.1984); *Memorial Hospital, supra; Saint Mary of Nazareth Hospital Center v. Department of Health and Human Services*, 698 F.2d 1337 (7th Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983).

The ability to wear personal clothing for a patient receiving intensive rehabilitation services would seem to be far more important than the presence of a bedside telephone. While the Secretary may rationally determine that personal laundry service is not medically necessary for patients receiving acute medical care, the court fails to grasp his reasoning in denying reimbursement for such services to patients receiving rehabilitation services to return home.

Plaintiff's arguments do not support its demand for reimbursement of its personal laundry expense for all its Medicare patients, as opposed to those in its rehabilitation program. However, plaintiff is entitled to show what percentage of its Medicare patients receiving rehabilitative care require personal laundry service as part of their medical therapy.

### Conclusion

This case is remanded to the Secretary for further proceedings consistent with this memorandum and order. So ordered.